[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-14950

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 20, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No.  87-01179-CV-T-N

JOHN DILLARD,
DAMASCUS CRITTENDEN, JR., et al.,

Plaintiffs-Appellants,

ROBERT R. BINION,
JOHN WRIGHT,

Intervenor-Plaintiffs-Appellants,

GILBERT GREEN,  et al.,

Intervenor-Plaintiffs-Appellees,

versus

CHILTON COUNTY COMMISSION,
ROBERT B. MARTIN, Probate Judge,

Defendants-Appellees,

_____

No. 06-15354

_____

D. C. Docket No.  87-01179-CV-T-N

GILBERT GREEN,
CALVIN JONES, JR.,

Intervenor-Plaintiffs-Appellants,

versus

CHILTON COUNTY COMMISSION
ROBERT B. MARTIN, Probate Judge,

Defendants-Appellees,

_____

Appeals from the United States District Court
for the Middle District of Alabama

_____

**(August 20, 2007)**

Before TJOFLAT, BLACK and EBEL,* Circuit Judges.

PER CURIAM:

---

* Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

2

In these appeals, this court is confronted again by a third-party attempt to intervene in a long-pending case to vacate injunctive relief entered below. Here, the challenged consent decree was obtained by a class of African-American plaintiffs as part of the landmark Dillard litigation that restructured much of Alabama's county-level governance in accordance with the then-prevailing understanding of the Voting Rights Act. We recognize that the intervenors raise significant questions about the ongoing vitality of the remedy approved by the district court nearly twenty years ago. However, we determine that, in light of recent Supreme Court precedent, they lack the standing necessary to challenge that remedy. Accordingly, we must VACATE the district court's orders and REMAND to the district court with instructions to DISMISS the intervenors' complaint without prejudice.

## BACKGROUND

We need not provide yet another extensive recapitulation of the Dillard litigation's lengthy history. See Dillard v. Baldwin County Comm'rs (Baldwin V), 376 F.3d 1260, 1262-63 (11th Cir. 2004). Suffice it to say that in 1988 the Chilton County Commission, by consent decree, settled claims raised by the class of African-American voters in Chilton County represented by John Dillard (collectively, "Dillard") under § 2 of the Voting Rights Act, 42 U.S.C. § 1973, and

3

the Equal Protection Clause of the Fourteenth Amendment.  See Dillard v. Chilton County Bd. of Educ., 699 F. Supp. 870, 872 (M.D. Ala. 1988).  The parties agreed, inter alia, to increase the number of commissioners from four to seven, to abolish the numbered-post system of electing commissioners and replace it with a cumulative voting system, and to institute a system by which the rotating Commission chairmanship would occasionally be offered to an African-American commissioner, if one had been elected.  (Rec. Doc. 5 at ¶¶ 1, 4.)  Subsequent decisions of the Supreme Court and this circuit cast this remedy into some doubt.  See Holder v. Hall, 512 U.S. 874 (1994); Nipper v. Smith, 39 F.3d 1494 (11th Cir. 1994) (en banc); Dillard v. Baldwin County Comm'rs (Baldwin III), 225 F.3d 1271 (11th Cir. 2000).[1]  In 2003, Gilbert Green and Calvin Jones, Jr., ("the Intervenors") moved to intervene in the instant case seeking to vacate the district court's order approving the 1988 settlement.  (Motion for Post-Judgment Intervention filed Feb. 21, 2003.)

In response to this Motion to Intervene, the County Commission filed a "Motion for Status Conference" in the district court.  (Motion for Status

---

[1]One of the issues presented by the merits of this appeal is whether the restrictions of Holder and Nipper apply to consent decrees where the form of the relief has been agreed to by the parties, in addition to consent to liability.  Because we dismiss this appeal for lack of jurisdiction, we do not address this merits issue.

Conference filed Feb. 28, 2003.)  In its motion, the Commission observed that

"[r]ecent case law indicates that the seven-member, cumulative-voting remedy was

not appropriate" and requested the district court "set this case for a status

conference, and at that time . . . discuss with the parties whether and to what extent

the settlement agreement remains viable . . . ."  (Id. ¶¶ 2-3.)  The district court

denied the motion, explaining that it would decide whether a status conference

was appropriate after resolving the pending motion for post-judgment

intervention.  (Order filed Mar. 7, 2003.)

Dillard filed a response on March 6, 2003, opposing both the proposed

intervention and the request for a status conference.  (Plaintiff's Response to

Green Motion to Intervene and to Defendant's Motion for Status Conference filed

Mar. 6, 2003.)  Citing Baldwin III and conceding that the district court was

"bound by Eleventh Circuit precedent to allow Green and Jones to intervene,"[2]

Dillard argued that the motion to intervene should be denied because the proposed

intervenors sought to intervene as plaintiffs.  (Id. ¶ 3.)  Intervention was granted

---

[2]In light of this concession, questions of timeliness and adequacy of representation are not before this court.  Accordingly, we offer no view on the propriety of the Green intervention under the standards imposed by Fed. R. Civ. P. 24(a).  We clarify, however, that Baldwin III did not address these questions either.  See 225 F.3d at 1274 ("Neither party opposed the Intervenors' motion, but both reserved the right to challenge the legal sufficiency of the Intervenors' complaint.").  Accordingly, it provides little, if any, analytical assistance for district courts addressing questions about the propriety of a proposed intervention under Rule 24.

by the district court in a brief order that did not give explicit consideration to either the Intervenors' standing to intervene nor the propriety of intervention under the standards of Fed. R. Civ. P. 24. (Order filed Mar. 20, 2003.)

Upon the district court's granting of the motion to intervene, the Intervenors' complaint-in-intervention was filed in the district court on the same day. (See Rec. Doc. 7 (Complaint-in-Intervention).) In five counts, the complaint argued that continued enforcement of the consent decree, both in specific respects and in toto, was unlawful. Specifically, Counts I and II contended (1) that, by altering the size of the Commission and by replacing the probate judge as its ex officio chair, the district court had exceeded its authority under the Voting Rights Act and violated the Tenth and Eleventh Amendments; (2) that the "parties' consent to the entry of the relief provided in the Consent Decree does not provide a sufficient basis for a court to require structural alterations in the form of government for Chilton County"; and (3) that conducting elections pursuant to the consent decree's terms "violates the Green Intervenors' constitutional rights." (Id. at 8-9 (¶¶ 16-17, 19-20).) Counts III and IV, denominated as seeking relief under Fed. R. Civ. P. 60(b)(5), stated that further prospective application of the consent decree was inequitable based on a change in law disavowing cumulative voting as a Voting Rights Act remedy and on an alleged lack of standing by Dillard, as well

as arguing that conducting elections pursuant to the consent decree "violates the Green Intervenors' voting rights." (Id. at 10-11 (¶¶ 22-23, 25-26).) Count V, finally, argued (1) that, by instituting the rotating Commission chairmanship system and "direct[ing] the Commission members to engage in conduct which violates the Equal Protection Clause of the Fourteenth Amendment," the district court had exceeded its authority under the Voting Rights Act and violated the Fifth Amendment; and (2) that conducting elections pursuant to the consent decree's terms "violates the Green Intervenors' constitutional and voting rights." (Id. at 11 (¶¶ 28-29).)

The Commission, acting under the threat of a motion for entry of default, answered the Intervenors' complaint by admitting virtually all allegations that the consent decree exceeded the district court's authority and violated federal law, though it denied all allegations that elections conducted pursuant to the decree's terms violated the Intervenors' constitutional or voting rights. (Rec. Doc. 8 (Answer) at 3-5.) The answer, however, did not join in the Intervenors' request for relief, nor did it pray independently for relief from continued application of the consent decree. (See id.) So far as the record reveals, the Commission took no action on its own behalf to invalidate the consent decree. Importantly, the Commission never filed any claim, cross-claim, or counterclaim asserting its own

7

rights and seeking to vacate the consent decree, nor did it file any claims of any nature against Dillard which would have revived the prior adversarial conflict between the original parties. Dillard subsequently filed briefs in opposition to the Intervenors, but filed no pleading responsive to the complaint-in-intervention, apparently because the complaint-in-intervention sought relief only against the Commission and codefendant Probate Judge Martin.

Following oral argument, the district court, believing itself bound by this court's decisions in Baldwin III and Baldwin V, agreed with the Intervenors' arguments and vacated the consent decree. Dillard v. Chilton County Comm'n, 447 F. Supp. 2d 1273, 1276-79 (M.D. Ala. Aug. 14, 2006). In a later order, it rejected the Intervenors' call for a prompt special election or, alternatively, prompt gubernatorial appointment of new commissioners. Dillard v. Chilton County Comm'n, 452 F. Supp. 2d 1193, 1202 (M.D. Ala. Sept. 21, 2006). It instead ordered the Commission to formulate via public hearings an election system to be used at the next regularly scheduled election and to present the plan to the Alabama Legislature for its approval. Id. at 1197, 1202.

After entry of the order vacating the consent decree, Dillard, as the original plaintiff, appealed, challenging the vacatur and further alleging that the Intervenors lacked standing to intervene in the first instance. In a separate appeal

8

consolidated with Dillard's, the Intervenors appealed the order setting forth the court's proposed mechanism and timeframe for unwinding the effects of the vacated consent decree. The Commission filed a brief only in the second of these appeals, omitting any consideration of the merits of Dillard's appeal. Instead, it limited its arguments to defending the district court's September 21, 2006, order that gave the Commission until the next regularly scheduled election to design and receive approval for a new governmental structure. Interestingly, the Commission's brief on appeal adopted Dillard's statement of the case, including Dillard's allegations that the Intervenors had suffered no personal injury and lacked standing. (Comm'n Br. at 2; see Dillard Br. at 7-9.)

The district court's order of August 14, 2006, vacating the consent decree and its order of September 21, 2006, establishing the timetable for unwinding the consent decree and enjoining the Commission to implement it, are each appealable interlocutory orders. We thus have jurisdiction over both of the instant appeals pursuant to 28 U.S.C. § 1292(a)(1).

### DISCUSSION

Any party, whether original or intervening, that seeks relief from a federal court must have standing to pursue its claims. Intervening parties, however, need not in every instance demonstrate that they independently fulfill the familiar

9

requisites of injury-in-fact, causation, and redressability. Because of lessened justiciability concerns in the context of an ongoing Article III case or controversy, intervenors in this circuit may in some cases be permitted to "piggyback" upon the standing of original parties to satisfy the standing requirement. This rule is not without limits: Intervenors must show independent standing to continue a suit if the original parties on whose behalf intervention was sought settle or otherwise do not remain adverse parties in the litigation. Similarly, "piggyback" standing requires the existence of a justiciable case or controversy at the point at which intervention is sought.

In the appeals now before us, we first address whether the Intervenors can establish independent standing. The Intervenors' claims that application of the consent decree violates their "constitutional and voting rights" rests upon this circuit's prior holdings that a voter's assertion of his or her interest in a democratically selected form of government describes a concrete and particularized injury sufficient to confer standing. However, in light of intervening Supreme Court precedent, we conclude this must now be labeled a generalized grievance, and we thus hold that these Intervenors have not independently met the standing requirement.

We then turn to the alternative issue of "piggyback" standing. The entry of the original consent decree resolved the underlying controversy between the original parties. And the long dormancy of this case on the district court's docket reveals nothing prior to the attempted intervention that resuscitated its adversarial character. Although the Commission's actions subsequent to the attempted intervention are at least ambiguous, the critical moment at which the Intervenors needed to establish the existence of a case or controversy upon which they could piggyback standing was at the time intervention was sought. Because we find no continuing adversarial controversy between the original parties at this point, the Intervenors could not piggyback on the standing of any of the original parties. Indeed, at no time during the district court proceedings following the motion to intervene did any original party assert a claim for further judicial relief against any other original party. Nor, on appeal, is there any adversity between the original parties to this action. Instead, all original parties seem united on the position that the Intervenors lacked standing to intervene.

Thus, these Intervenors cannot demonstrate that they had standing under either of the avenues available to them for doing so. Accordingly, we conclude the district court lacked jurisdiction over their claims.

**I.  Under <u>Lance v. Coffman</u>, the Intervenors have no independent standing to bring the generalized claims in the Complaint-in-Intervention.**

Although the district court below concluded under the logic of <u>Baldwin III</u> that the Intervenors had sufficiently alleged an individualized injury, 447 F. Supp. 2d at 1278-79, standing is "a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims," and we review the district court's conclusion on this question de novo, <u>Baldwin III</u>, 225 F.3d at 1275.  Among the three requirements of this "irreducible constitutional minimum," first and foremost is an allegation of "an injury in fact — an invasion of a legally protected interest which is concrete and particularized and actual or imminent, not conjectural or hypothetical."  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992) (quotations omitted).  "An interest shared generally with the public at large in the proper application of the Constitution and laws will not do." <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 65 (1997).  Federal courts, bound by Article III, are "not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution."  <u>Hein v. Freedom From Religion Found., Inc.</u>, 127 S. Ct. 2553, 2562 (2007).  And "a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen's interest in proper application of the

Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an Article III case or controversy." Id. at 2563-64 (quoting Lujan, 504 U.S. at 573-74).

Baldwin III analyzed jurisdictional facts essentially identical to those in this case and determined that intervening citizen voters had standing to challenge another Dillard consent decree. 225 F.3d at 1277. In doing so, it relied on our prior conclusions in an earlier case that citizens' interests in challenging a newly imposed election scheme to which they are subject were sufficiently concrete and particularized to confer standing. Id. Specifically, Baldwin III relied heavily on our decision in Meek v. Metropolitan Dade County, in which we held that voters who attempted to intervene as appellants to defend an election system against a Voting Rights Act challenge had standing. See 985 F.2d 1471, 1480 (11th Cir. 1993) (per curiam). In Meek,

> [t]he intervenors sought to vindicate important personal interests in maintaining the election system that governed their exercise of political power, a democratically established system that the district court's order had altered. As such, they alleged a tangible actual or prospective injury and did not merely challenge unlawful conduct in the abstract. See generally, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, [574-76], 112 S.Ct. 2130, 2144, 119 L.Ed.2d 351 (1992). Moreover, we reject appellees' contention that the intervenors had only nonjusticiable generalized grievances simply because they asserted interests widely shared by others. Allen v. Wright, 468 U.S. 737, 756-60, 104 S.Ct. 3315, 3327-29, 82 L.Ed.2d 556 (1984).

13

Id.

We subsequently upheld <u>Meek</u>'s reasoning against repeated challenges that it was wrongly decided in light of the Supreme Court's later decisions in <u>Arizonans for Official English</u>, 520 U.S. at 43, <u>Raines v. Byrd</u>, 521 U.S. 811

(1997), and <u>United States v. Hays</u>, 515 U.S. 737 (1995).[3]  <u>See</u> <u>Baldwin III</u>, 225

[3]In <u>Arizonans for Official English</u>, sponsors of a state ballot provision that amended the state constitution to make English the official state language intervened to appeal a district court's decision declaring the amendment unconstitutional, after the state defendants decided not to appeal.  Though the Supreme Court doubted that initiative sponsors had "legislative standing" to defend the amendment's constitutionality, it did not reach the question, instead finding their claims moot.  But as we noted in <u>Baldwin III</u>, "[t]he question of whether [the intervenors] had standing as the sponsors of particular legislation . . . provides no guidance on whether <u>voters</u> who live within the governing unit have standing to challenge an allegedly illegal voting scheme to which they are subject by virtue of their residence."  225 F.3d at 1278-79.

Similarly, in <u>Raines</u>, members of Congress challenged the constitutionality of the Line Item Veto Act, but their claims were dismissed for lack of standing.  <u>Baldwin III</u> again found this ruling made no impact on the vitality of <u>Meek</u>, stating that

> the fact that the Congressmembers in <u>Raines</u> did not have standing to challenge the Act because they had not been harmed as individuals, but only as members of an institution which they were not authorized to represent, sheds no light on whether the voters in this case, who are individually subject to and affected by the election scheme they challenge, have standing.

<u>Id.</u> at 1279.

In <u>Hays</u>, voters challenged a state legislative redistricting plan, arguing that an adjacent district's boundaries had been unlawfully influenced by considerations of the racial makeup of that district's voters.  The Supreme Court rejected their claims, but emphasized "that voters who lived in the allegedly gerrymandered district would have suffered an injury sufficient to establish standing."  <u>Id.</u>  We again held in <u>Baldwin III</u> that <u>Hays</u> did not diminish the precedential value of <u>Meek</u>:

> <u>Hays</u> set forth a bright-line standing rule for a particular class of cases alleging illegal racial gerrymandering with respect to voting districts: if the plaintiff lives in the racially gerrymandered district, she has standing; if she does not, she must produce specific evidence of harm other than the fact that the composition of her district might have been different were it not for the gerrymandering of the other district. <u>Hays</u>' narrow holding regarding standing in the gerrymandering context is entirely consistent with our broader holding in <u>Meek</u> that respondents had standing to defend the election scheme to which they were subject when that entire election scheme had been challenged as illegal. In both cases, the essential point remains that one who resides in the area directly affected by the allegedly illegal voting scheme has standing to challenge that scheme. <u>Hays</u> is in no way inconsistent with our holding in <u>Meek</u>.

<u>Id.</u> at 1279-80.

F.3d at 1278-80; Wilson v. Minor, 220 F.3d 1297, 1303 n.11 (11th Cir. 2000).

But it is clear that we can no longer do so in light of the Supreme Court's most recent pronouncement on voter standing in Lance v. Coffman, 127 S. Ct. 1194 (2007) (per curiam).[4]  In Lance, voter plaintiffs filed suit in federal district court to challenge a court-ordered redistricting plan, arguing that the Elections Clause of Art. I, § 4, required a legislatively drawn plan and that elections held under the court-drawn plan were unlawful.  Id. at 1195-96.  Their asserted interest was as citizen voters in the district that they alleged should have been legislatively, rather than judicially, drawn.  They claimed that judicial drawing of the district violated the right of all citizens in the district to have the district drawn by the state legislature as prescribed by the Elections Clause of Art. I, § 4 of the United States Constitution.  Id.  The Supreme Court unanimously held that the Lance plaintiffs should be dismissed for lack of standing and their claim dismissed as a generalized grievance.  Id. at 1198.  The Court noted that

---

[4]Baldwin III's distinctions of prior Supreme Court precedents do not save Meek in light of Lance.  In contrast to Arizonans for Official English, Raines, and Hays, the claims at issue in Lance, which the Court held did not satisfy standing requirements, are directly analogous to those that we held sufficient to establish standing in Meek.  Like Hays, Lance considers voter, not legislator, standing.  127 S. Ct. at 1195-96.  But Lance dismissed for lack of standing the claims of voter plaintiffs even though they voted in the district where the governmental structure was being challenged as unconstitutional.  Id. at 1198.  Thus, Meek can no longer carry the weight attributed to it by the Intervenors, the district court, and our prior precedents.

16

> the problem with [the plaintiffs'] allegation should be obvious: The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing. See, e.g., Baker v. Carr, 369 U.S. 186, 207-208, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962).

Id.

The distinction referenced in Lance refers to the difference between plaintiffs such as those in Baker and Whitcomb v. Chavis, 403 U.S. 124 (1971), who alleged concrete and personalized injuries in the form of denials of equal treatment or of vote dilution, and plaintiffs like those in the instant case, Baldwin III, or Lance itself, who merely seek to protect an asserted interest in being free of an allegedly illegal electoral system. This properly denominates as cognizable, for instance, the injuries of plaintiffs who are subject to racial classification in voting systems, see e.g., Shaw v. Reno, 509 U.S. 630 (1993), and to vote dilution, whether motivated by race or other factors, see, e.g., Thornburg v. Gingles, 478 U.S. 30 (1986) (racially motivated vote dilution); Baker, 369 U.S. at 186 (non-racially motivated vote dilution); Leser v. Garnett, 258 U.S. 130 (1922) (gender-based vote dilution).[5] But the mere generalized grievances asserted by the

---

[5]In supplemental briefing to this court addressing the impact of Lance upon our analysis of the Green Intervenors' standing, the Green Intervenors argue that the Supreme Court's citation

17

Intervenors here do not assert a concrete and personalized injury, and accordingly they lack personal standing to bring them for judicial resolution.

The Intervenors assert only the generalized incompatibility of the consent decree with the rights of all citizens in the county to be free of judicial interference, unauthorized by § 2 of the Voting Rights Act, with the democratically selected form of local governance.[6] This is not a form of injury particularized to the Intervenors, but is rather an undifferentiated harm suffered in common by all citizens of the county.

The Intervenors themselves have consistently described their claims in terms that underscore the lack of particularized harm, and they echo the

_____

in Lance to Fairchild v. Hughes, 258 U.S. 126 (1922), and the contrasting absence of a citation to Leser suggest another category of particularized injuries in voting rights cases which remain cognizable under Lance. Namely, they contend that "[w]hen State law allows a private claim about law and a particular voter if focused on a particular place, instead of the public at-large [sic], Article III does not preclude relief to a voter." We read this as an argument that state law may, in some instances, confer a judicially cognizable and particularized interest, the invasion of which may constitute an injury for purposes of Article III standing analysis. See Warth v. Seldin, 422 U.S. 490, 500 (1975).

Even accepting this general point, however, we conclude it provides no benefit to the Green Intervenors here. The state law upon which their claims appear to be founded is one which merely defines the structure of county governance; they do not suggest any state law that provides them with a particularized cognizable interest. The interest created by a structural law of this type is necessarily generalized to all voters in the county. In that regard, it is an interest that is legally indistinguishable from that rejected in Lance.

[6]The Intervenors did not claim, of course, that the Commission could not on its own and following the procedures of Alabama law decide to have seven commissioners elected by cumulative voting. Their objection is only that this form of government could not be imposed by judicial decree.

18

allegations found to be insufficient in Lance.  In their initial motion to intervene,

they framed their claims not as personal ones, but rather as citizens' claims

seeking to force the district court and the County Commission to follow federal

law:

> Movants seek to challenge certain aspects of the remedial order of [the district court] entered on or about June 23, 1988 . . . .  In particular, Movants believe that the remedial order is not in conformity with recent judicial rulings which prohibit a federal court from ordering an increase in the size of local elected bodies, as a part of its remedy for a violation of the Voting Rights Act.

(Motion for Post-Judgment Intervention filed Feb. 21, 2003.)  On appeal, the

Intervenors expressed their claim as follows:  "Fundamentally, the 1988 order

provided relief[] which was not authorized by the Voting Rights Act.  Because it

also impaired the interests of Alabama and its citizens in their chosen form of local

government . . . , it was inconsistent with a proper construction of the Act."[7]

---

[7]The Green Intervenors, in their supplemental briefing, attempt to inflate this argument and transform their claims as citizens into "actions 'on behalf of the state.'"  In so doing, they contend that they are indistinguishable from relators pursuing causes of action belonging to the state, not merely "private citizens acting on their own behalf."  See Lance, 127 S. Ct. at 1198 (citing Smiley v. Holm, 285 U.S. 355 (1932) and Ohio ex rel. Davis v. Hildebrant, 241 U.S. 565 (1916), as examples of relator standing accruing under the Elections Clause).  However, the Green Intervenors have never purported to be suing as relators, even if they were asserting interests of the State of Alabama.  Their Complaint-in-Intervention and their briefs before this court have consistently made clear that the Green Intervenors are asserting their interests as private citizens.  These interests, as we describe, are not particularized to the Green Intervenors and are thus too generalized to support standing.  Moreover, they provide us with no citations to state or federal statutes giving private citizens authority as relators to maintain an action on behalf of the State or the county commission.

(Aple. Br. at 13.)  According to the Intervenors' conception of the rights and interests at issue here,

> [v]acating the 1988 order reflects proper respect for the right of local governments to constitute themselves in the manner provided by their States.  Further, the district court's [vacatur] order preserves Tenth Amendment rights, a proper understanding of sovereignty in a federal system, and the limits of Congress's authority under the Reconstruction Era Amendments.

(Id. at 15-16.)  And, the Intervenors contend, because the consent decree "exceeds [the district court's] authority granted by Congress in the Voting Rights Act, and violates the Tenth and Eleventh Amendments," elections conducted under the consent decree's terms "violate [their] constitutional rights."  (Rec. Doc. 7 at 8-9 (Complaint ¶¶ 16-17).)  The only "constitutional right[]" to which they advert, however, is the putative right shared by all citizens to be governed by their "democratically chosen form of local government."[8]  (Aple. Br. at 29.)

---

[8]Count V of the Complaint-in-Intervention, addressing the rotation of the Commission chairmanship, does not purport to state a claim of violation of the Intervenors' personally held rights under the Equal Protection Clause of the Fourteenth Amendment.  Rather, it merely raises the same allegations as elsewhere that the district court, by imposing unauthorized injunctive relief, exceeded its authority and violated legal rights held by the Commission members.  In that count, the Intervenors allege that the consent decree "directs the Commission members to engage in conduct which violates the Equal Protection Clause of the Fourteenth Amendment . . . to the extent it provides for commissioners to be offered the chair of [the] Commission . . . on the basis of the race of the commissioner."  (Rec. Doc. 7 at 11 (Complaint ¶ 28).)  The gravamen of this claim is that Commission members' rights against invidious racial classification are being violated by the consent decree provision, as enforced by the district court.  And, like the other claimed violations of the Intervenors' "constitutional and voting rights" (id. at ¶ 29), this is a generalized grievance shared in common by all voters in Chilton County based on the Intervenors' asserted interest in seeing that the law is followed.  Accordingly, it too falls under

20

As already noted, the Intervenors do not seriously argue that either the addition of Commission members or the use of cumulative voting inherently constitutes an affirmative violation of § 2 of the Voting Rights Act. Rather, they argue only that such measures are not authorized by § 2 as forms of remedial relief against antecedent violations. (Id. at 21, 30.) Moreover, they expressly disclaim any injury based on vote dilution or other, more concrete harms. "The district court was correct that Green did not complain of vote dilution, but § 2 [of the Voting Rights Act] and the precedents of this Court do not require him to do so." (Id. at 27.) Their assertion of rights purportedly secured under § 2 and the Tenth and Eleventh Amendments is grounded entirely in the injury analysis of Baldwin III. (Id. at 26-27, 29.) Under this analysis, the Intervenors assert they "ha[ve] standing to seek to restore [their] democratically chosen form of government." (Id. at 45.)

---

the rule of Lance.

Count V suffers from the further defect that it fails to allege that the provision has ever been invoked to offer an African-American commissioner the chairmanship, that any such offer has been accepted, or that any potential offer is likely to be accepted in the future. (See id. at ¶¶ 28-29.) Absent such allegations of "actual or imminent, not conjectural or hypothetical" harm, Lujan, 504 U.S. at 560, the Intervenors have failed to allege a cognizable, actual or imminent injury-in-fact. The allegation that "Probate Judge Martin has conducted elections for members of the Chilton County Commission in a manner that violates the Green Intervenors' constitutional and voting rights" bears no obvious connection to equal protection violations occurring among the Commission members at an unspecified later time. Thus, the Intervenors fail to allege a cognizable injury for standing purposes under Count V as well.

21

The Intervenors' claims thus can be easily summarized. Aggrieved by the changes in the structure of their county government wrought by the 1988 consent decree, they sought to vacate it. The decree was unlawful, according to the Intervenors, not because it affected their voting power or subjected them to invidious racial classification or otherwise injured them directly. Rather, the decree was unlawful because the district court, which approved the consent decree, exceeded its statutory remedial authority, violated the Tenth and Eleventh Amendments, and forced the County Commission to violate the Fourteenth Amendment by rotating its chairmanship to include African-American commissioners. The Intervenors allege the district court could neither enter such a decree nor enforce it once entered. And they allege the County Commission and the Probate Judge could not legally conduct elections pursuant to its terms.

But in light of Lance v. Coffman, "the problem with [these] allegation[s] should be obvious." 127 S. Ct. at 1198. "The only injury [the Intervenors] allege is that the law" — specifically, § 2 of the Voting Rights Act and the Fifth, Tenth, and Eleventh Amendments — "has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance" that the Supreme Court has warned must not be countenanced. Id. And the Intervenors' interest in "restor[ing] their] democratically chosen form of government" (Aple Br. at 45) is no more

22

individualized than the Lance plaintiffs' interest in overturning judicially drawn electoral districts in favor of legislatively drawn ones.[9]

"The decision to seek review 'is not to be placed in the hands of concerned bystanders,' persons who would seize it 'as a vehicle for the vindication of value interests.'" Arizonans for Official English, 520 U.S. at 64-65 (quoting Diamond v. Charles, 476 U.S. 54, 62 (1986)). Neither the injury nor the interest asserted by the Intervenors here can be distinguished from those dismissed in Lance. Therefore, we hold that the Intervenors fail to allege a particularized injury-in-fact sufficient to confer Article III standing independent of the original parties to this action.

## II. The Intervenors cannot piggyback on the standing of the original parties.

Having determined that the Intervenors cannot establish Article III standing of their own account, we turn now to the alternative mechanism available to them for doing so: piggybacking upon the standing of the original parties. However,

---

[9]In their supplemental briefing, the Green Intervenors attempt to distinguish their claims from those at issue in Lance by arguing that they seek only to defend, not overturn, the manner of elections established by state law. They are, of course, actively seeking to change the status quo, and they have requested affirmative relief from the 1988 consent decree. Regardless, then, of whether they are defending or attacking the state-sanctioned election system, they have an obligation as post-judgment intervenors, similar to that placed on plaintiffs, to show that they have standing to bring their claims before a federal court. And the interests they have asserted are too generalized to support their own independent standing under Lance.

doing so requires the existence of an ongoing adversarial case or controversy among existing parties, and the lack of any adversarial character in the relations between the original parties when the motion to intervene was filed indicates no sufficiently adversarial case or controversy was ongoing into which the Intervenors could inject themselves without making an independent showing of Article III standing. Neither the mere existence of a consent decree nor the continuation of the district court's jurisdiction for enforcement purposes is enough to support piggyback standing absent an existing dispute between the original parties for which they seek a judicial resolution.

Commonly, intervenors "ride 'piggyback' on the . . . undoubted standing" of original parties to an ongoing case or controversy. Diamond, 476 U.S. at 64. Indeed, we have formalized this rule, stating that "a party seeking to intervene need not demonstrate that he has standing in addition to meeting the requirements of Rule 24 as long as there exists a justiciable case or controversy between the parties already in the lawsuit." Chiles v. Thornburgh, 865 F.2d 1197, 1213 (11th Cir. 1989). This general policy, however, "presumes that there is a justiciable case into which an individual wants to intervene." Id. at 1212.

However, when the original parties have settled the claims between them, and the intervenor wishes to challenge the settlement, we have required the

intervenor to have independent standing.  E.g., <u>Cox Cable Commc'ns, Inc. v. United States</u>, 992 F.2d 1178, 1181 (11th Cir. 1993) (requiring intervenor to demonstrate standing to appeal entry of permanent injunction settling claims between original parties).  <u>Diamond</u> itself dismissed a defendant-intervenor's appeal for lack of standing to appeal where none of the original defendants pursued the appeal alongside him.  476 U.S. at 68.  The rule was stated:  "[A]n intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III."  <u>Id.</u>  "Generally, an intervenor must have independent standing if the intervenor would be the only party litigating a case."  <u>United States v. One-Sixth Share of James J. Bulger In All Present And Future Proceeds Of Mass Millions Lottery Ticket No. M246233</u>, 326 F.3d 36, 40 (1st Cir. 2003).

We believe this rule extends to the situation presented here.  So long as an original party on the intervenor's side remains party to the action and maintains an adversarial litigating position vis-a-vis the opposing parties, at least in this circuit an intervenor need not make an independent showing that he or she meets the standing condition of Article III.  <u>Chiles</u>, 865 F.2d at 1213; <u>see also</u> <u>Diamond</u>, 476

25

U.S. at 68-69 (leaving undecided the question whether every intervenor must demonstrate standing in addition to the requirements of Fed. R. Civ. P. 24(a)).[10]

Here, however, there are no unsettled adverse claims in litigation between the original parties, either in the district court or on appeal. The settlement of Dillard's claims by entry of the consent decree ended the adversarial character of the original controversy between Dillard and the Commission. See Lambert v. Turner, 525 F.2d 1101, 1102 (6th Cir. 1975) (per curiam) ("Upon entry of the consent decree . . . there was before the district court no extant case or controversy between the defendant and any plaintiff.").

> The entry of the consent decree, with the full support of all the settling parties, changed the calculus. While the parties to the decree are still parties to the action and to the appeal, they are now opponents in name only; in practical effect, the plaintiffs and the settling defendants no longer represent opposing interests. The underlying controversy between them has been resolved. Hence, given the case's current posture, there is no longer any extraneous support to which [the

---

[10]Other circuit courts have split in answering the question that the Supreme Court left open in Diamond. The Second, Fifth, Sixth, Ninth, and Tenth Circuits have joined this circuit's general rule that proposed intervenors need not demonstrate standing to intervene in an ongoing controversy. See San Juan County v. United States, 420 F.3d 1197, 1204-05 (10th Cir. 2005) (permitting intervention without an independent showing of standing); United States v. Tennessee, 260 F.3d 587, 595 (6th Cir. 2001) (same); Ruiz v. Estelle, 161 F.3d 814, 829-30 (5th Cir. 1998) (same); Yniguez v. Arizona, 939 F.2d 727, 731 (9th Cir. 1991) (same); U.S. Postal Serv. v. Brennan, 579 F.2d 188, 190 (2d Cir. 1978) (same). The Seventh, Eighth, and D.C. Circuits, on the other hand, require a demonstration of intervenor standing in all cases. See Jones v. Prince George's County, 348 F.3d 1014, 1017 (D.C. Cir. 2003) (requiring intervenors demonstrate standing in addition to Rule 24 requirements); South Dakota v. Ubbelohde, 330 F.3d 1014, 1023 (8th Cir. 2003) (same); Solid Waste Agency v. U.S. Army Corps of Eng'rs, 101 F.3d 503, 507 (7th Cir. 1996) (same).

Intervenors] may cling [for purposes of the piggyback standing analysis].

United States v. AVX Corp., 962 F.2d 108, 112 (1st Cir. 1992).  The mere existence of a permanent injunction or consent decree thus is insufficient to provide an ongoing case or controversy upon which an intervenor may "ride 'piggyback,'" in Diamond's phrase.  See 476 U.S. at 64 (requiring intervening doctor independently to demonstrate standing to appeal injunction enjoining enforcement of abortion law where original state defendants declined to appeal); Cox Cable Commc'ns, 992 F.2d at 1181 (inquiring into intervenor's standing, independent of original parties, in order to appeal entry of an injunctive decree that settled claims between original parties).

The district court's perpetuation of its jurisdiction for purposes of enforcement of a consent decree is insufficient, by itself, to justify piggybacking. See United States v. Accra Pac, Inc., 173 F.3d 630, 633 (7th Cir. 1999) ("Like many another decree, this one reserved to the court the power of enforcement.  But general language about continuing jurisdiction must be limited to enforcement of the decree when the parties are at loggerheads about some concrete subject, lest it condone a violation of Article III.").

The test of whether there is an ongoing litigation claim or controversy between the original parties to a consent decree must be whether one party or the other to the decree is seeking "judicial resolution of [the] dispute." See Diamond, 476 U.S. at 62. "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements" of a case or controversy, id., unless one party is actually seeking judicial relief against another. Here, although the Commission, in its answer to the complaint-in-intervention, could be viewed as being supportive of the Intervenors' claim for relief, the fact remains that it was the Intervenors' claim. The Commission itself never made any claim of its own for judicial relief against Dillard following entry of the consent decree. Thus, there was no existing case or controversy between the Commission and Dillard as to which the Intervenors could ride piggyback to establish standing.[11]

Though not cited to us by either party, we have considered whether the result we reach is inconsistent with our prior decision in Loyd v. Alabama Department of Corrections, 176 F.3d 1336 (11th Cir. 1999). Upon close

---

[11]Of course, nothing in this opinion would preclude one of the original parties from bringing an additional claim against another existing party, under the district court's retained jurisdiction, to vacate, amend, or enforce the consent decree. However, no such effort was made or was outstanding in this case.

examination, we find that <u>Loyd</u> is inapposite. In <u>Loyd</u>, the Alabama Attorney General, acting, along with the Commissioner of the Alabama Department of Corrections, as the Department's representative, intervened in federal district court after entry of a consent decree in order to seek termination of the decree under the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. <u>Id.</u> at 1338-39. Following the district court's decision to terminate the decree, the original prisoner plaintiffs appealed, opposed by the intervenor, while several original defendants, "[w]hile ambivalent about their position, . . . remained active in opposing the appeal of the district court's order." <u>Id.</u> at 1338-39 & 1339 n.2. Addressing first the Attorney General's intervention in the district court, we dismissed the appellants' claim that the intervenor was required to demonstrate standing because "a party seeking to intervene need not demonstrate that he has standing in addition to meeting the requirements of Rule 24 as long as there exists a justiciable case or controversy between the parties already in the lawsuit." <u>Id.</u> at 1339 (quoting <u>Chiles</u>, 865 F.2d at 1213). We thus refused to dismiss the Attorney General's claim for lack of standing to intervene in the district court. <u>Id.</u> Turning to the question of standing to appeal, we noted that the intervenor was the appellee, not the appellant, and that the original defendants continued to oppose the appeal of the consent decree's termination. <u>Id.</u> at 1339 n.2. Accordingly, we

29

found an extant case or controversy in this court that also allowed the appeal to proceed.  Id.

Loyd did not expressly address the jurisdictional issue before us.  Any precedent one might attempt to draw from Loyd on the instant issue would have to be from inferences based on sub silentio jurisdictional conclusions in that case.[12] "But it is well-established circuit law that 'we are not bound by a prior decision's sub silentio treatment of a jurisdictional question.'"  Main Drug, Inc. v. Aetna U.S. Healthcare, Inc., 475 F.3d 1228, 1231 (11th Cir. 2007) (quoting Okongwu v. Reno, 229 F.3d 1327, 1330 (11th Cir. 2000)).

The long period of quiescence which followed the entry of the consent decree indicates that the parties considered the controversy underlying the decree to have been resolved.  The Commission has not sought judicial relief from the consent decree, notwithstanding its apparent sympathies supportive of the Intervenors' claim.  We thus conclude that, at the time intervention was sought, there was no basis upon which the Intervenors could justify piggyback standing.

---

[12]We further note that, in filing its motion to terminate the consent decree there, "[t]he Attorney General claimed status as an intervenor under 18 U.S.C. § 3626(b)(2) of the PLRA and as a representative of the Alabama Department of Corrections," an original defendant and party to the consent decree.  176 F.3d at 1338-39 (emphasis added).  The district court could have taken jurisdiction of the motion to terminate its earlier consent decree on this alternative basis, which would have obviated the need for any inquiry into the Attorney General's separate standing in the district court.

The standing of a prospective intervenor, whether independent or piggyback, is properly measured at the time intervention is sought in the district court. See Comer v. Cisneros, 37 F.3d 775, 801 (2d Cir. 1994) ("[T]he intervenors certainly had standing at the time they filed their motions to intervene."). In a case involving a class action seeking to remedy delays in processing of welfare-benefits applications, the Second Circuit provided a useful illustration of the timing of the standing evaluation for intervenors:

> In the present case, the original plaintiff at the time the complaint was filed, and each intervenor at the time of her motion to intervene, was suffering from a delay beyond the period provided by federal law for the processing of her application for Food Stamp or ANFC benefits. Thus, at the material time, each plaintiff was suffering injury capable of being redressed by declaratory or injunctive relief. Accordingly, the district court erred in ruling that Appellants did not have standing . . . .

Robidoux v. Celani, 987 F.2d 931, 938 (2d Cir. 1993) (emphases added); see also Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1090, 1093 (Fed. Cir. 1998) ("As a general matter, parties should possess rights before seeking to have them vindicated in court."); cf. Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003) ("[A plaintiff's] Article III standing must be determined as of the time at which the . . . complaint is filed."); Johnson v. Bd. of Regents, 263 F.3d 1234, 1267 (11th Cir. 2001) ("[A] party's standing to sue is generally measured at the time of the complaint, with the effect of subsequent

31

events generally analyzed under mootness principles."); Lujan, 504 U.S. at 570 n.5 ("[S]tanding is to be determined as of the commencement of suit . . . .").

Here, at the time the Intervenors filed their motion to intervene, there was no extant controversy or pending legal claim between the original parties — Dillard and the Commission. Even if we look at events subsequent to the motion to intervene, we find no ongoing extant judicial case or controversy between the Commission and Dillard to which the Intervenors could assert piggyback standing. Subsequent to the motion to intervene, the Commission never filed any claim, cross-claim, or counterclaim asserting any claim for judicial relief against Dillard. Notwithstanding the Commission's apparent sympathy with the Intervenors' claim, the Commission itself asserted no renewed claim for legal relief against Dillard.

Even on appeal, the Commission has scrupulously avoided arguing that the district court order vacating the consent decree should be upheld. On the merits of the district court order vacating the consent decree, the Commission is silent. The only position the Commission argues on appeal is that, if the consent decree is set aside, the district court was correct in not ordering immediate restructuring but rather allowing the Commission time to accomplish an orderly restructuring. Dillard does not take issue with that position of the Commission on appeal. So,

32

even on appeal, we have no extant judicial controversy between the original parties to which the Intervenors could assert piggyback standing. In fact, it is telling that on appeal when Dillard asserted in his brief that the Intervenors lacked standing to assert their claims, the Commission adopted and agreed with that portion of Dillard's brief.

We, therefore, conclude that there was no ongoing case or controversy between the original parties to this litigation, either at the time the motion to intervene was filed or at any later time in the district court, nor is there any case or controversy between the original parties that is presented to this court on appeal. Thus, there is no dispute upon which the Intervenors can seek to piggyback standing.

## CONCLUSION

These Intervenors are unable to establish individualized standing under Lance v. Coffman, because they present only generalized grievances seeking to force the County Commission to follow federal constitutional and statutory law. They are unable to establish "piggyback" standing based on an ongoing legal claim and dispute between the original parties to the litigation, because neither in the district court nor on appeal is there any ongoing legal claim for relief asserted by one of the original parties against the other. The Intervenors therefore lack

standing on either of the bases available to them as intervenors, and their claims must be dismissed. Accordingly, we **VACATE** the orders of the district court terminating the consent decree and **REMAND** to the district court with instructions to **DISMISS** the Intervenors' claims, without prejudice, for lack of standing.