# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 28, 2011

Lyle W. Cayce
Clerk

Nos. 10-50290, 10-50416

LEAGUE OF UNITED LATIN AMERICAN CITIZENS, DISTRICT 19,

Plaintiff - Appellee

v.

CITY OF BOERNE; PATRICK R. HEATH, Mayor; R.L. BIEN; DONALD L. GOURLEY; ANN REISSIG; BEN STAFFORD; RANDY BEDWELL, all in their official capacities as members of the City Council for the City of Boerne, Kendall County, Texas,

Defendants - Appellees

MICHAEL R. MORTON,

Movant - Appellant

Appeals from the United States District Court
for the Western District of Texas

Before BARKSDALE, DENNIS, and HAYNES, Circuit Judges.

DENNIS, Circuit Judge:

The appellant, Michael R. Morton, seeks to intervene in a suit under the Voting Rights Act that was originally filed in 1996 by the League of United Latin American Citizens, District 19 ("LULAC"), against the city of Boerne, Texas. LULAC and the city reached a settlement agreement in 1996, and the district court entered a consent decree which provided that city council members would thereafter be elected through at-large elections with cumulative voting. In 2009, LULAC and the city filed a joint motion to

No. 10-50290

reopen the case and modify the consent decree in order to switch to a single-member-district system. The district court granted that motion. Morton, a resident and registered voter in Boerne who opposes the change, filed a motion to intervene. The district court denied the motion on the grounds that Morton lacked standing. Morton has appealed. The city and LULAC have filed appellate briefs urging affirmance of the district court's denial of Morton's motion to intervene; they argue that he lacks standing and that this appeal is moot. Morton contends that he has standing and has a right to intervene. He further argues that this court should render judgment in his favor because the district court lacked the power to reopen the case, and alternatively because LULAC's and the city's motion fail to justify the modification of the consent decree. We conclude that (1) Morton has standing; (2) the case is not moot; and (3) Morton has a right to intervene in the case under Rule 24(a)(2) of the Federal Rules of Civil Procedure. Accordingly, we REVERSE the district court's denial of Morton's motion to intervene. We also conclude that (1) the district court had the power to modify the consent decree; but (2) the district court abused its discretion in granting LULAC and the city's motion to modify because the record did not show that modification was warranted. Therefore, we VACATE AND REMAND the district court's order granting the modified consent decree.

## BACKGROUND

In 1995, the city of Boerne, Texas, adopted a home rule charter pursuant to article XI, section 5 of the Texas Constitution. The city charter provided for, inter alia, a city council with five members elected on an at-

No. 10-50290

large, numbered-post basis.  Under the charter, elections were to be held once per year for two-year terms, with three council members to be elected in one year and two council members plus the mayor to be elected the next year.  *See* City of Boerne Home Rule Charter §§ 3.02, 4.05(B).[1]

The Texas Constitution provides that city charters may be adopted or amended "by a majority vote of the qualified voters of said city, at an election held for that purpose."  Tex. Const. art. XI, § 5.  In accordance with this state constitutional provision, the city charter of Boerne states: "Amendments to this Charter may be framed, proposed, and adopted in the manner provided by the laws of the State of Texas."  City of Boerne Home Rule Charter § 10.07.

Soon after the city adopted its charter, LULAC brought suit in federal court under the Voting Rights Act against the city and its mayor and city council members in their official capacities.  LULAC's complaint alleged that the city charter's at-large, numbered-post election system unlawfully diluted the voting strength of minority voters, specifically Mexican-Americans, in violation of section 2 of the Voting Rights Act.[2]  In December 1996, the city and LULAC reached a settlement agreement which provided that city council

---

[1] Under the numbered-post system as set forth in the city charter, the five positions on the city council are designated by number, 1 through 5, and each candidate for city council specifies one position for which he or she seeks election.  For each numbered position, the candidate receiving the highest number of votes is elected.  This system may be contrasted with a system in which all candidates for city council run for all the positions that are up for election, and the two or three open positions in a given year are filled by the two or three candidates who receive the greatest number of votes.  *See City of Lockhart v. United States*, 460 U.S. 125, 127 (1983) (describing how a numbered-post system works).

[2] *See generally Sensley v. Albritton*, 385 F.3d 591, 594-95 (5th Cir. 2004) (setting forth the required elements of a vote dilution claim under section 2 of the Voting Rights Act and *Thornburg v. Gingles*, 478 U.S. 30 (1986)).

3

No. 10-50290

members would be elected on an at-large basis through cumulative voting[3] instead of the numbered-post system. The district court entered a consent decree in accordance with the settlement agreement.

The city thereafter held elections in accordance with the consent decree. One Hispanic member was elected to the city council in 1997. She was then reelected unopposed in 1999 and 2001; both of those elections were canceled because no candidate opposed any of the incumbents. In 2003, the Hispanic council member faced an opposing candidate for the first time and was defeated. LULAC and the city have stipulated that no Hispanic candidate has run for a position on the city council since 2003.

On December 2, 2009, the city council held a special meeting to discuss changing from at-large elections to single-member districts. Michael R. Morton, the appellant, spoke at that meeting in opposition to the change. The council voted 3-2 to file a joint motion with LULAC, asking the federal district court to enter a modified consent decree providing for single-member districts.

At the same meeting, the council also passed an ordinance establishing five single-member districts and delineating their boundaries. However, the issue was not submitted to the voters, as would be required under the Texas Constitution in order to modify the city charter. Thus, the provisions of the

---

[3] "Under a cumulative voting scheme, . . . each voter has as many votes as there are posts to be filled, and the voter may cast as many of his votes as he wishes for a single candidate. The system thus allows a numerical minority to concentrate its voting power behind a given candidate without requiring that the minority voters themselves be concentrated into a single district." *Holder v. Hall*, 512 U.S. 874, 909 n.15 (1994) (Thomas, J., concurring in the judgment) (citing Joseph F. Zimmerman, *The Federal Voting Rights Act and Alternative Election Systems*, 19 Wm. & Mary L. Rev. 621, 654-57 (1978)).

4

No. 10-50290

city charter, as originally enacted in 1995, requiring an at-large, numbered-post voting system, remain unamended.  City of Boerne Home Rule Charter §§ 3.02, 4.05(B).

On December 9, 2009, the city and LULAC filed a joint motion asking the district court to reopen the case and enter a modified consent decree.  The joint motion stated: "The cumulative voting system has failed to produce the results desired by either LULAC or the CITY . . . .  The parties wish to modify the Compromise Settlement Agreement to provide for election of the City Council under a single member electoral district system instead of cumulative voting, in hopes of producing the desired remedy with respect to minority candidate and voter participation and voting strength."

The district court entered an order reopening the case and adopting the proposed modified consent decree on December 11, 2009.  The order did not give specific reasons for the court's decision or contain any findings of fact or conclusions of law.  It stated, inter alia, "that upon completion of all steps necessary to implement the single member district electoral process . . . , the parties shall promptly present a joint motion to dismiss to the Court."

On January 6, 2010, Morton filed a motion to intervene, seeking to oppose the modified consent decree.  The district court denied this motion on March 17, 2010, on the grounds that Morton lacked Article III standing, relying primarily on *Lance v. Coffman*, 549 U.S. 437 (2007).

Meanwhile, also on January 6, 2010, the city submitted the proposed change to the United States Department of Justice (DOJ) for preclearance under Section 5 of the Voting Rights Act.  *See generally Nw. Austin Mun. Utility Dist. No. 1 v. Holder*, 129 S. Ct. 2504, 2509-10 (2009) (describing the

No. 10-50290

preclearance requirement under section 5).  The DOJ granted preclearance on March 8, 2010.

The city and LULAC filed a joint motion to dismiss on April 14, 2010, and the district court granted that motion on April 19, 2010.  Morton, who had already filed a timely notice of interlocutory appeal from the denial of his motion to intervene, then filed a timely notice of appeal from the district court's order dismissing the case.  The two appeals were consolidated.

## ANALYSIS

### I.

The district court denied Morton's motion to intervene because it concluded that he lacked Article III standing.  We review a district court's decision to dismiss for lack of standing de novo.  *E.g.*, *Ordonez-Orosco v. Napolitano*, 598 F.3d 222, 225 (5th Cir.), *cert. denied*, 131 S. Ct. 389 (2010).

Under *Ruiz v. Estelle*, 161 F.3d 814 (5th Cir. 1998), a would-be intervenor must establish that he has Article III standing if, inter alia, he is not seeking any relief that is "also being sought by at least one subsisting party with standing to do so." *Id.* at 830.  Morton is plainly seeking different relief from what the subsisting parties, LULAC and the city, are seeking, because he urges the court to reject the amended consent decree that LULAC and the city jointly sought.  Therefore, as the district court correctly held, Morton must establish that he has Article III standing.

The three well-known components of standing are injury in fact, causation, and redressability.  *E.g.*, *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 302 (5th Cir. 2009).  The district court held that Morton failed to establish injury in fact, in that he had stated "only a generalized grievance

No. 10-50290

rather than a concrete and particularized injury that is required for standing." The Supreme Court has explained, "We have consistently held that a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an Article III case or controversy" and therefore lacks standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992).

Contrary to the district court, we believe that Morton has stated an injury that is more than a generalized grievance and is sufficiently concrete and particularized to fulfill the injury-in-fact requirement of Article III standing doctrine. Morton argues, inter alia, that the modified consent decree deprives him of his right under the Boerne city charter to vote for all five members of the city council. The charter gives him this right by providing that all members of the council will be elected on an at-large basis — but instead, under the modified consent decree, he is only able to vote for the one council member in whose single-member district he resides.[4] This deprivation of a pre-existing right to vote for certain elected officials is very similar to an injury which our court, sitting en banc, held was sufficient for Article III standing purposes in *League of United Latin American Citizens,*

---

[4] To be clear, Morton does not claim to have suffered any violation of a voting right under the U.S. Constitution or a federal statute such as the Voting Rights Act. Rather, his claim, which is sufficient to show an injury in fact for Article III standing purposes, is that he has a voting right under the city charter and this right has been abridged by the modified consent decree.

No. 10-50290

*Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993) [hereinafter *LULAC No. 4434*] (en banc).

In *LULAC No. 4434*, the plaintiffs (LULAC and ten individual voters) sued various state officials, seeking injunctive relief and claiming that Texas's system of electing state trial judges on a countywide basis "violate[d] § 2 of the Voting Rights Act by impermissibly diluting the voting power of Hispanics and blacks" in nine Texas counties. *Id.* at 838. The district court allowed several parties to intervene in the suit, including, as relevant here, "two Texas district court judges, in their individual capacities — Sharolyn Wood, 127th District Court in Harris County, and Harold Entz, 194th District Court in Dallas County." *Id.* at 837. The district court ruled in the plaintiffs' favor, "found [that] county-wide elections violated § 2 in all nine counties . . . [and] divided the nine counties into electoral subdistricts. . . ." *Id.* at 838. This court stayed the district court's order pending appeal, and a panel held that there was no violation of § 2.[5] The case was then reheard en banc, and the en banc court held that § 2 did not apply to state judicial elections at all.[6] The Supreme Court granted certiorari and reversed, holding that § 2 applies to judicial elections.[7] Next, the case was remanded to the original panel, which

---

[5] *League of United Latin Am. Citizens Council No. 4434 v. Clements*, 902 F.2d 293 (5th Cir. 1990).

[6] *League of United Latin Am. Citizens Council No. 4434 v. Clements*, 914 F.2d 620 (5th Cir. 1990) (en banc).

[7] *Houston Lawyers' Ass'n v. Attorney Gen. of Tex.*, 501 U.S. 419 (1991).

No. 10-50290

affirmed the district court's findings of violations of § 2 in eight of the nine counties.[8] This court then granted rehearing en banc again.

At that point, the plaintiffs, the Texas Attorney General, and some other officials who were parties to the suit agreed on a proposed settlement of the case. *LULAC No. 4434*, 999 F.2d at 839. In accordance with this agreement, the Attorney General filed a motion requesting that the en banc court remand the case to the district court for entry of a consent decree which would "provid[e] for the election of the vast majority of judges in the nine . . . counties by subdistricts." *Id.*[9] However, some parties, including the aforementioned Judges Wood and Entz, opposed the proposed consent decree. "Anticipating the question of how the case [could] be settled without the agreement of [Wood and Entz], the plan allow[ed] [them] to be elected in a county-wide election. The stated purpose was to deny [them] standing to object." *Id.* Accordingly, the Attorney General argued that Wood and Entz

---

[8] *League of United Latin Am. Citizens Council No. 4434 v. Clements*, 986 F.2d 728 (5th Cir. 1993).

[9] The proposed decree would have changed the method by which most of the state trial judges in the nine counties at issue were elected: instead of being elected on an at-large, countywide basis, they would thereafter mostly be elected from smaller districts.

More specifically, the then-existing system of electing trial judges was as follows: "Texas voters elect their trial judges in county-wide elections. A voter may vote for all of the trial courts of general jurisdiction in her county. At the same time, each trial court is a distinct court, such as the 134th judicial district court of Dallas County, with county-wide jurisdiction and its own history of incumbents. A candidate runs for a particular court." *LULAC No. 4434*, 999 F.2d at 837-38.

The proposed decree would have changed the system as follows: "By the decree, 152 judges would run in districts smaller than a county, while 22 would continue to be elected at-large. District boundaries would mirror state representative districts in Dallas, Harris, Bexar, and Jefferson counties. Justice of the peace districts would be used in Tarrant County. In Lubbock, Ector, and Midland counties, judges would run from the existing commissioners court districts." *Id.* at 839.

9

No. 10-50290

lacked Article III standing. *See id.* at 844. But the en banc court rejected that argument and held that Wood and Entz had standing to object to the proposed decree. *Id.* at 845. The court reasoned that even if they might lack standing as elected officials, Wood and Entz nonetheless had standing "as voters" because "[t]he settlement agreement would deprive voters of the right to vote for all judges with general jurisdiction over their county." *Id.* (citing *Meek v. Metro. Dade Cnty., Fla.*, 985 F.2d 1471 (11th Cir. 1993)).[10]

The injury that Morton has suffered due to the modified consent decree in the present case is essentially indistinguishable from the injury that established Wood and Entz's standing in *LULAC No. 4434*. Morton's injury is that he, as a voter, is deprived of his pre-existing right to vote for all the members of the city council which has jurisdiction over the city where he lives. Therefore, *LULAC No. 4434* compels us to conclude that Morton's injury is sufficient to fulfill the injury-in-fact requirement of Article III standing doctrine.

The district court, in reaching the opposite conclusion, relied on *Lance v. Coffman*, 549 U.S. 437 (2007). However, the facts of *Lance* are readily distinguishable from those of *LULAC No. 4434* and the present case. In *Lance*, the plaintiffs were "four Colorado citizens" who contended that the Elections Clause of the U.S. Constitution[11] required the state of Colorado to

---

[10] The en banc court accordingly denied the Attorney General's motion to remand for entry of the proposed consent decree, *LULAC No. 4434*, 999 F.2d at 840, and ultimately held that the method of electing judges in the nine counties at issue did not violate the Voting Rights Act, *id.* at 837. For present purposes, our focus is on the holding that Wood and Entz had Article III standing to object to being deprived of the right to vote in the election of a judge to every judicial office in their respective counties.

[11] U.S. Const. art. I, § 4, cl. 1.

No. 10-50290

use congressional districts drawn by the state legislature, rather than those drawn by a state court, to elect members of the U.S. House of Representatives. 549 U.S. at 438. The Supreme Court held that the plaintiffs lacked standing because they asserted only an "undifferentiated, generalized grievance about the conduct of government. . . ." *Id.* at 442. What distinguishes *Lance* from the present case is that in *Lance*, the plaintiffs were not deprived of the right to vote for any office. They each undoubtedly had a right to vote for one member of the U.S. House of Representatives in a single-member district; the only thing at stake in *Lance* was whether they would vote in districts drawn by the state legislature or by a state court. By contrast, in the present case and in *LULAC No. 4434*, the type of injury that serves as the basis for standing is the deprivation of a voter's pre-existing right to vote for certain offices. Therefore, *Lance* does not cast any doubt on the continuing validity of our en banc court's holding in *LULAC No. 4434* that Wood and Entz, as voters, had suffered concrete and particularized injuries which satisfied the injury-in-fact requirement of Article III standing doctrine.[12] And because Morton's injury is of essentially the same kind and effect as Wood and Entz's injuries, *viz.*, a complete deprivation of his right to vote in the election of persons to particular offices, *Lance* does not affect our conclusion that Morton, too, satisfies the injury-in-fact requirement.

---

[12] In addition to *Lance*, the district court also relied on *Dillard v. Chilton County Commission*, 495 F.3d 1324 (11th Cir. 2007). That case cannot override our reliance on *LULAC No. 4434*, because it is from another circuit. Moreover, *Dillard* is distinguishable on its facts because, like *Lance*, it did not involve any deprivation of a person's right to vote for a particular office.

11

No. 10-50290

In addition to injury-in-fact, Morton also satisfies the other two requirements of Article III standing doctrine: causation and redressability. *See Lujan*, 504 U.S. at 560-61. The causation element does not require a party to establish proximate causation, but only requires that the injury be "fairly traceable" to the defendant. *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). Here, Morton's injury is directly caused by the modified consent decree, which is fairly traceable to LULAC and the city because they are the parties that agreed on the modified consent decree and submitted it to the district court. The redressability requirement is satisfied if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 167. Morton's injury would certainly be redressed by the invalidation of the modified consent decree,[13] since that would have the effect of restoring his right to vote in the election of all five members of the city council. Therefore, we conclude that Morton has Article III standing.

## II.

The city suggests that this case may be moot because of the possibility that the DOJ, exercising its powers under section 5 of the Voting Rights Act, might refuse to preclear a change from a single-member-district system back to an at-large voting system in Boerne, and thereby prevent Morton from obtaining any effective relief in this case.[14] (The DOJ has already precleared

---

[13] In this decision, we are vacating the modified consent decree and remanding for further proceedings, for reasons explained below. It remains to be seen whether Morton will ultimately prevail on the merits.

[14] As explained by the Supreme Court in *Riley v. Kennedy*, 553 U.S. 406 (2008), "[s]ection 5 requires covered jurisdictions to obtain what has come to be known as 'preclearance' from the District Court for the District of Columbia or the DOJ before 'enact[ing] or seek[ing] to administer' any alteration of their practices or procedures affecting voting." *Id.*

12

No. 10-50290

the change to the single-member-district system under the modified consent decree, as noted above.) According to the city, the DOJ would likely view such a change as diluting the voting strength of minorities in Boerne, and therefore would likely refuse to preclear it. If that happened, the city argues, this court and the district court would then be unable to grant Morton any effective relief because the DOJ would prevent the city from restoring the at-large voting system. This inability to grant effective relief would, in the city's view, render Morton's claims moot. *See Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008) ("A case should not be declared moot '[a]s long as the parties maintain a concrete interest in the outcome and effective relief is available to remedy the effect of the violation . . . .'" (alterations in original) (internal quotation marks omitted) (quoting *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998)), in turn citing *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 571 (1984)); Erwin Chemerinsky, *Federal Jurisdiction* § 2.5.1, at 130 (5th ed. 2007) ("[T]he mootness doctrine is derived from Article III's prohibition against federal courts issuing advisory opinions.").[15]

---

at 412 (alterations in original) (quoting 42 U.S.C. § 1973c(a)). "A change will be precleared only if it 'neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or [because of membership in a language minority group].'" *Id.* (alteration in original) (quoting 42 U.S.C. § 1973c(a)). "An election practice has the 'effect' of 'denying or abridging the right to vote' if it 'lead[s] to a retrogression in the position of racial [or language] minorities with respect to their effective exercise of the electoral franchise.'" *Id.* (alterations in original) (quoting *Beer v. United States*, 425 U.S. 130, 141 (1976)).

[15] The city also argues that even if this case is technically not moot under Article III, we should apply the doctrine of "prudential mootness," which has been adopted by some other circuits. For instance, the Ninth Circuit has suggested that "[p]erhaps some cases that are 'anticipatorily moot' might permissibly be dismissed under a doctrine of 'prudential mootness,' adopted by some of our sister circuits, under which a court can dismiss an appeal not

No. 10-50290

However, we conclude that this case is not moot because under *Riley v. Kennedy*, 553 U.S. 406 (2008), if the modified consent decree is determined to be invalid, the city will not need to obtain preclearance from the DOJ in order to go back to the at-large voting system that it has used since 1997. In *Riley*, the relevant facts were as follows. The Alabama legislature passed a law adopting a new local election practice — namely, filling midterm vacancies on the Mobile County Commission by special election rather than by gubernatorial appointment. *Id.* at 414. The DOJ precleared the law, and a special election was held in accordance with it. *Id.* at 414-15. After the special election was announced but before it was held, a Mobile County voter filed suit in state court, challenging the law on state constitutional grounds. *Id.* After the election was held, the Alabama Supreme Court held that the law was invalid because it violated the state constitution. *Id.* at 415. Subsequently, another midterm vacancy occurred on the Mobile County Commission, and the governor appointed a commissioner to fill the vacancy. *Id.* at 416. A group of Mobile County voters filed suit in federal court under section 5 of the Voting Rights Act, seeking an injunction preventing the

---

technically moot if 'circumstances [have] changed since the beginning of litigation that forestall any occasion for meaningful relief.'" *Hunt v. Imperial Merchant Servs., Inc.*, 560 F.3d 1137, 1142 (9th Cir. 2009) (second alteration in original) (quoting *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997)). The Tenth Circuit, following the D.C. Circuit, has stated that "[i]n some circumstances, a controversy, not [constitutionally] moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Bldg. & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1491-92 (10th Cir. 1993) (alterations in original) (quoting *Chamber of Commerce v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)) (internal quotation marks omitted). We need not decide whether to adopt the doctrine of prudential mootness because, as explained below, the federal courts are fully capable of granting Morton effective relief if he prevails.

14

No. 10-50290

governor from making such an appointment "unless and until Alabama gained preclearance" of its change from special elections back to gubernatorial appointments as the method of filling midterm vacancies. *Id.* A three-judge district court ruled in the plaintiffs' favor and gave the state 90 days to obtain preclearance. *Id.* at 416-17. The DOJ denied preclearance, and the district court vacated the governor's appointment of the county commissioner. *Id.* at 417. The governor then appealed to the United States Supreme Court, which reversed. *Id.* at 429. The Supreme Court reasoned that "a law challenged at first opportunity and invalidated by Alabama's highest court is properly regarded as null and void *ab initio*, incapable of effecting any change in Alabama law or establishing a voting practice for § 5 purposes." *Id.* at 425. The Court therefore held that "the State's reversion to its prior practice did not rank as a 'change' requiring preclearance." *Id.* at 411.

The circumstances in *Riley* are closely analogous to the circumstances created by the potential invalidation of the modified consent decree in this case. In *Riley*, the law that adopted the new election practice "was challenged in state court at first opportunity, the lone election was held in the shadow of that legal challenge, and the Act was ultimately invalidated by the Alabama Supreme Court." *Id.* at 425. Essentially the same situation exists in this case: Morton challenged the modified consent decree in court at the earliest opportunity; Boerne has held an election using the new single-member-district system while this litigation has been pending; and, in this decision, we are vacating the modified consent decree (although it may or may not ultimately be invalidated on the merits). The only noteworthy difference is that here, the challenge is proceeding in the federal courts rather than the

15

No. 10-50290

state courts. But the reasoning and holding of *Riley* did not depend on that distinction. We therefore conclude that the city will not need to obtain preclearance under section 5 before it can revert to holding at-large elections for its city council under the rules that were in place before the modified consent decree was entered. Consequently, the federal courts have the ability to provide effective relief in this case, and so the case is not moot.

### III.

We next consider whether Morton has a right to intervene in this case under Rule 24(a)(2) of the Federal Rules of Civil Procedure. The rule states: "On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Accordingly, we have held that "[a] party seeking to intervene as of right must satisfy four requirements: (1) [t]he application must be timely; (2) the applicant must have an interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede its ability to protect its interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit." *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994). We address each of these four requirements in turn and conclude that Morton fulfills them and has a right to intervene.

No. 10-50290

"Although the timeliness of intervention is generally reviewed for abuse of discretion, where the district court makes no finding regarding timeliness, we review this factor *de novo*." *Id.* at 1205 n.2 (internal citation omitted). Here, the district court did not reach the question of intervention as of right, and there are no disputed facts that are relevant to the issue of timeliness, so we address the issue de novo. As we stated in *Ruiz v. Estelle*, 161 F.3d 814 (5th Cir. 1998), there are "four factors by which to evaluate the timeliness of an intervention motion. They are: (1) the length of time applicants knew or should have known of their interest in the case; (2) prejudice to existing parties caused by applicants' delay; (3) prejudice to applicants if their motion is denied; and (4) any unusual circumstances." *Id.* at 827.

As to the first timeliness factor, Morton acted quite quickly to intervene in this case. The city council voted in favor of the modified consent decree on December 2, 2009; the city and LULAC filed their joint motion to modify the consent decree on December 9; and the district court entered its order granting the motion on December 11. Morton filed his motion to intervene on January 6, 2010, four weeks after the city and LULAC filed their joint motion. That is a fairly short period of time for a person to obtain counsel, explore his legal options, and file a motion to intervene.

As to the second factor, neither the city nor LULAC claims to have been prejudiced by the fact that Morton took four weeks to intervene, and it is hard to imagine how they could have been.

As to the third factor, Morton would be severely prejudiced if his motion to intervene was denied, because he appears to have no other possible procedural vehicle for his attempt to persuade the courts that the modified

consent decree should be vacated. Morton has raised a nonfrivolous argument that the modified consent decree does not meet the requirement stated in *LULAC No. 4434* that "any federal decree must be a tailored remedial response to illegality." 999 F.2d at 847. "A consent decree must arise from the pleaded case and further the objectives of the law upon which the complaint is based." *Id.* at 846. Morton argues that there is simply no current violation of federal law to be remedied by the modified consent decree. Furthermore, "[c]ourts must be especially cautious when parties seek to achieve by consent decree what they cannot achieve by their own authority." *Id.* Such is the case here, because without the modified consent decree, the city would have needed to get the approval of a majority of Boerne voters in order to amend the city charter to switch to single-member districts.[16] Morton likely cannot pursue the invalidation of the modified consent decree by filing a separate suit in federal court, because he does not appear to have any independent cause of action available to him under federal law. And a state court would lack power to vacate the federal court's consent decree. Thus, it appears that the only way Morton can oppose the modified consent decree is by intervening in this case. Consequently, he would be severely prejudiced by the denial of his motion to intervene.

The fourth and last timeliness factor is "any unusual circumstances." *Ruiz*, 161 F.3d at 827. The parties have not identified any relevant unusual circumstances. Therefore, all four timeliness factors either favor Morton or are neutral. Morton's motion to intervene is timely, satisfying the first requirement of Rule 24(a)(2) for intervention as of right.

---

[16] *See* Tex. Const. art. XI, § 5; City of Boerne Home Rule Charter § 10.07.

No. 10-50290

The second requirement of Rule 24(a)(2) is that "the applicant must have an interest relating to the property or transaction that is the subject of the action. . . ." *Sierra Club*, 18 F.3d at 1204. Here, the "transaction that is the subject of the action" is the modified consent decree. Morton has an "interest relating to" the modified consent decree because he seeks to protect his right to vote in elections to choose all five city council members, a right which the decree abrogates.[17] This is a sufficient interest to satisfy Rule 24(a)(2). *See Carter v. Dies*, 321 F. Supp. 1358, 1360 (N.D. Tex. 1970) (three-judge district court) (granting voters' motion to intervene as of right based on their "claim that [very large] filing fees deprive them of the right to vote for a candidate of their own choice"), *aff'd sub nom. Bullock v. Carter*, 405 U.S. 134 (1972); *see also Johnson v. Mortham*, 915 F. Supp. 1529, 1536 (N.D. Fla. 1995) ("Registered voters have . . . a sufficiently substantial interest to intervene[] in an action challenging the voting district in which the voters are registered.").

The third requirement for intervention as of right under Rule 24(a)(2) is that "the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede its ability to protect its interest." *Sierra Club*, 18 F.3d at 1204-05. The disposition of this action may render Morton entirely unable to protect his interest in his pre-existing right to vote in elections of all five city council members because, as explained above, he

---

[17] This same interest is also the basis of Morton's Article III standing, as discussed above. *Cf. Meek v. Metro. Dade Cnty., Fla.*, 985 F.2d 1471, 1480 (11th Cir. 1993) ("[A] movant who shows standing is deemed to have a sufficiently substantial interest to intervene."), *abrogated on other grounds*, *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1331-32 (11th Cir. 2007).

No. 10-50290

appears to have no other procedural vehicle to seek the invalidation of the modified consent decree. Thus, Morton satisfies the third requirement.

The fourth and final requirement is that "the applicant's interest must be inadequately represented by the existing parties to the suit." *Id.* at 1205. The existing parties here — LULAC and the city — oppose the relief that Morton seeks; thus, they do not adequately represent his interest. Therefore, Morton fulfills all four requirements of Rule 24(a)(2) and has a right to intervene in this case.

## IV.

Morton argues that this court should not only reverse the district court's denial of his motion to intervene, but also render judgment outright in his favor, on the grounds that the district court lacked the power to reopen the case. He contends that at the time when the district court reopened the case, there was no continuing case or controversy between LULAC and the city, and therefore the district court lacked subject matter jurisdiction. However, as the Supreme Court has held, federal courts have continuing power to modify their existing injunctions, including consent decrees, when changing circumstances make it appropriate to do so.

In *John Doe #1 v. Veneman*, 380 F.3d 807 (5th Cir. 2004), we explained as follows:

> The usual rule in federal cases is that an actual controversy must exist at all stages of litigation, not merely at the time the complaint is filed. Where a controversy no longer exists, a claim based on that controversy is moot.
>
> "In general, a matter is moot for Article III purposes if the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." [*Sierra Club v. Glickman,*

156 F.3d 606, 619 (5th Cir. 1998).] To have a legally cognizable interest in the outcome, a plaintiff must demonstrate an injury traceable to the defendant that is susceptible to some judicial remedy. [*Baccus v. Parrish*, 45 F.3d 958, 961 (5th Cir. 1995).] "Generally settlement of a dispute between two parties renders moot any case between them growing out of that dispute." [*ITT Rayonier Inc. v. United States*, 651 F.2d 343, 345 (5th Cir. 1981).]

*John Doe #1*, 380 F.3d at 814. Based on this and similar cases, Morton argues that the present case was rendered moot by the settlement between LULAC and the city in 1996 which produced the original consent decree. Further, Morton reasons that because LULAC and the city were in agreement on their joint motion filed on December 9, 2009, asking the court to reopen the case and modify the consent decree, there was no case or controversy between the parties at that time and therefore the case was moot and the district court lacked subject matter jurisdiction.

However, the Supreme Court and our court have stated that federal courts have inherent equitable power to modify their own decrees, including consent decrees. In *United States v. Swift & Co.*, 286 U.S. 106 (1932), the Court observed, "We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent. . . . If the reservation [of power to amend the consent decree] had been omitted [by the court], power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *Id.* at 114. The Court added, "The result is all one whether the decree has been entered after litigation or by consent. In either event, a court does not abdicate its power to revoke or modify its mandate, if

21

satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." *Id.* at 114-15 (citation omitted). In a later case, the Court further explained, "The source of the power to modify [an existing consent decree] is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *Sys. Fed'n No. 91, Ry. Emps.' Dept., AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961). And our court has likewise stated, "An injunction is by nature an equitable decree. The power of a federal court that enters an equitable injunction is not spent simply because it has once spoken. The federal courts have always affirmed their equitable power to modify any final decree that has prospective application." *United States v. Lawrence Cnty. Sch. Dist.*, 799 F.2d 1031, 1046 (5th Cir. 1986). These cases make clear that when a court approves a consent decree that has been agreed upon by all the parties in a case, the court does not thereby deprive itself of the power to take any further actions.

Morton's mootness argument, if accepted, would lead to anomalous and unworkable results. It would make it impossible for courts to modify consent decrees due to changing circumstances, in precisely the set of cases where all parties agreed that a decree should be modified. For instance, suppose that the parties in a Voting Rights Act case agreed on a consent decree establishing single-member districts,[18] and then several years later new census data became available, and the parties agreed on adjustments to the

---

[18] For example, in *Perkins v. City of Chicago Heights*, 47 F.3d 212 (7th Cir. 1995), "the parties agreed to a consent decree that included a new voting map consisting of six single member districts." *Id.* at 215.

No. 10-50290

districts based on the new data. If the parties' agreement was enough to render the case moot, the court would be unable to modify its decree, and the outdated decree would have to remain in force indefinitely until some new disagreement arose between the parties. Such results are not required by the Supreme Court's cases dealing with the modification of consent decrees. On the contrary, the Court has recognized that "[t]he upsurge in institutional reform litigation since *Brown v. Board of Education* has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380 (1992) (citation omitted).

We therefore conclude that the district court had "the power . . . to modify [its] injunction in adaptation to changed conditions, though it was entered by consent." *Swift & Co.*, 286 U.S. at 114.

## V.

Having established that the district court had the power to modify its equitable injunction based on changed circumstances, we now consider whether the district court's order modifying the consent decree was proper, given the record before it. We conclude that it was not.[19]

---

[19] Morton, relying on *Horne v. Flores*, 129 S. Ct. 2579 (2009), argues that we should reverse the district court's order because LULAC and the city failed to show that the modified consent decree will remedy an existing violation of federal law. We need not reach this argument because we first conclude that LULAC and the city failed to show that modification was warranted under the flexible standard that the Supreme Court articulated in *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992). On remand, Morton may raise the issue first in the district court.

No. 10-50290

Consent decrees are subject to Federal Rule of Civil Procedure 60(b). *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992). A district court may modify an injunction if "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). It may also consider "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). We review a district court's decision to grant or deny relief under Rule 60(b) for abuse of discretion. *Frazar v. Ladd*, 457 F.3d 432, 435 (5th Cir. 2006).

District courts must take a flexible approach to motions to modify consent decrees and to motions to modify or vacate institutional reform decrees. *Rufo*, 502 U.S. at 379-80, 381. Flexibility is "often essential to achieving the goals of reform litigation." *Id.* at 381; *see also Horne v. Flores*, 129 S. Ct. 2579, 2594-95 (2009) (confirming the "'flexible approach' to Rule 60(b)(5) motions" that the Court articulated in *Rufo*, 502 U.S. at 381). *Rufo* established a 2-step test for determining whether modification is warranted. First, the party seeking modification must show that "a significant change either in factual conditions or in law" that "make compliance with the decree substantially more onerous [or] . . . unworkable because of unforeseen obstacles[,] . . . or when enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384. Second, the court must then "consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 383.

To meet the first part of the test, the party seeking modification must show that the change in circumstance is "significant," and not merely that "it is no longer convenient to live with [the decree's] terms." *Id.* at 383. A party may be able to fulfill this first step by showing that the decree was not

No. 10-50290

meeting its intended purpose. *See Police Ass'n of New Orleans* ex rel. *Cannatella v. New Orleans*, 100 F.3d 1159, 1168 (5th Cir. 1996) ("It is settled that, to the extent a decree is drafted to deal with events in the future, the court must remain continually willing to modify the order to ensure that it accomplishes its intended result." (citing *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 252 (1968)). In *United Shoe*, the Supreme Court considered a case in which the government alleged that "time and experience ha[d] demonstrated" that an anti-trust decree had failed to accomplish its intended results, and argued that the lower court therefore should modify the decree and order a different remedy. *United Shoe*, 391 U.S. at 249. The Court concluded that modification in such a case — where there were no factual or legal changes other than recognition of the fact that the initial remedy had failed — may be warranted if the moving party proves its claim. *Id.* at 249, 252. The Court in *Rufo* cited *United Shoe* positively to support the proposition that courts should apply a flexible approach when deciding modification requests. *Rufo*, 502 U.S. at 379.[20]

---

[20] We also have confirmed, post-*Rufo*, that "the court must remain continually willing to modify the order to ensure that it accomplishes its intended result." *Cannatella*, 100 F.3d at 1168 (citing *United Shoe*, 391 U.S. at 252). Numerous other courts have continued to rely upon the Court's conclusion in *United Shoe*, after *Rufo*. *See, e.g.*, *Sierra Club v. Meiburg*, 296 F.3d 1021, 1033-34 (11th Cir. 2002) (concluding that petitioner had failed to meet its burden to show that modification was warranted under *Rufo* or *United Shoe*); *Doe Sr. 1-13 v. Bush*, 261 F.3d 1037, 1063-64 (11th Cir. 2001) (citing both *Rufo* and *United Shoe* in concluding that changed circumstances and failure to achieve the decree's aims both may warrant decree modification); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 101-02 (2d Cir. 1995) (concluding that *Rufo* does not "undermine[] the vitality" of *United Shoe* and that the cases together form the standard for modifying anti-trust decrees); *Favia v. Ind. Univ. of Pa.*, 7 F.3d 332 (3d Cir. 1993) (noting that courts may rely on *United Shoe* when a plaintiff proposes modification of a consent decree, even post-*Rufo*).

No. 10-50290

The burden is on the moving party to prove that modification is warranted, regardless of whether the party seeks to lessen its own responsibilities under the decree, impose a new and more effective remedy, or vacate the order entirely. *Rufo*, 502 U.S. at 384; *United Shoe*, 391 U.S. at 249; *see Sierra Club v. Meiburg*, 296 F.3d 1021, 1033-34 (11th Cir. 2002) (affirming the denial of a motion to modify a consent decree because the plaintiff failed to show a change in law and failed to show either that there was a change in factual circumstances or that the decree's purpose had not been achieved). The district court must therefore examine the evidence on the record and consider whether the moving party met its burden.

We conclude that the paucity of the record in this case provided an insufficient basis for the district court to determine that modification was warranted. LULAC and the city argue that modification was warranted because cumulative voting had failed to achieve the decree's purpose. In this case, the decree's purpose is to alleviate the impermissible dilution of the votes of a protected class, which is prohibited by Section 2 of the Voting Rights Act of 1965. 42 U.S.C. § 1973. The parties provided only the following allegations in support of in their joint motion for modification: that since the decree was entered there had been only one minority candidate to run for city council, and that this candidate won one contested election, won two uncontested elections, and then lost one contested election. Assuming arguendo these allegations are correct, LULAC and the city have not shown that the original consent decree had failed to achieve its intended purpose or that there has been any other significant change in circumstance.

26

No. 10-50290

The district court is, of course, allowed to consider "[t]he extent to which members of a protected class have been elected to office" in determining if there has been impermissible vote dilution under the Voting Rights Act. *See* 42 U.S.C. § 1973(b). The district court therefore also may consider such evidence in determining whether the remedy chosen to rectify impermissible vote dilution is achieving its intended goal. However, the parties offered only information regarding one candidate, who won as many competitive elections as she lost. This information did not provide the district court with a sufficient basis for finding that minority voters supported this candidate in her losing election, that voter dilution caused her loss, or that minority voter dilution was preventing other minority-preferred candidates from being elected. The evidence does not show which candidates the protected class tended to support in other elections or what the outcomes of those elections were. Nor did the record show that minority-preferred candidates did not run for office because they believed that under the current cumulative voting scheme they had no chance of winning. The *Rufo* standard is flexible and the district court necessarily has great authority over modification motions. However, it must base its decision on evidence that shows a significant change in circumstance. The record here does not support such a showing.

LULAC and the city had the opportunity to include additional facts in their joint motion to modify the consent decree, to file a summary of facts relied upon in the motion, and to file supporting affidavits and other pertinent documents. *See* W.D. Tex. Local Rules CV-7(b). The court had discretion to request further submissions or to schedule a conference or

27

hearing on the matters. *Id.* at CV-7(e), (h). Neither the moving parties nor the district court exercised these options. As a result, the record consists only of the three-page motion that LULAC and the city jointly submitted, which alleged only that one minority candidate had run for city council in thirteen years, and that she was elected but later lost her only contested bid for reelection.

Counsel for LULAC and the city represented at oral argument that they are prepared to provide evidence to show that "time and experience" have demonstrated that the initial consent decree was not achieving its purpose, and that the modified consent decree will remedy impermissible and ongoing protected class vote dilution. However, they did not present this evidence in their motion to the district court. The district court granted the motion without requiring such evidence — and, therefore, without requiring LULAC and the city to meet the first step of the *Rufo* test. Because we find that LULAC and the city failed to meet its burden under the first step, we therefore need not reach the question of whether or not the district court abused its discretion with regard to the second step of the *Rufo* test, which requires the district court to determine whether the proposed relief is "suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383.

For these reasons, we conclude that the district court abused its discretion in granting LULAC's and the city's joint motion to modify the consent decree. On remand, the district court should permit supplemental filings and conduct proceedings, as necessary, to develop a sufficient record in order to decide whether, consistent with this opinion, modification of the consent decree is appropriate.

No. 10-50290

**CONCLUSION**

For the foregoing reasons, we REVERSE the district court's denial of Morton's motion to intervene; and VACATE the district court's order adopting the modified consent decree, and its April 19, 2010 order granting LULAC's and the city's joint motion to dismiss. We REMAND with instructions to the district court to grant Morton's motion to intervene and conduct further proceedings consistent with this opinion.