**GEORGIA AQUARIUM, INC., Plaintiff,**

v.

**Penny PRITZKER, in her Official Capacity as Secretary of Commerce, National Oceanic and Atmospheric Administration, and National Marine Fisheries Service, Defendants.**

**Civil Action No. 1:13–CV–3241–AT.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed April 18, 2014.

George John Mannina, Jr., Ashley J. Remillard, Nossaman, LLP, Irvine, CA; Daniel Francis Diffley, Meaghan Goodwin Boyd, Alston & Bird, Atlanta, GA, for Plaintiff Georgia Aquarium, Inc.

Clifford Eugene Stevens, Jr., U.S. Department of Justice, Washington, DC, Lisa D. Cooper, Lori M. Beranek, U.S. Attorney's Office, Northern District of Georgia, Atlanta, GA, for Federal Defendants.

Tyler Joseph Sniff, Donald D.J. Stack, Stack & Associates, P.C., for Movants and Intervenor–Defendants Animal Welfare Institute, Whale and Dolphin Conservation, Whale and Dolphin Conservation, Inc. (North America), Earth Island Institute, Inc., and Cetacean Society International, Inc.

## ORDER

AMY TOTENBERG, District Judge.

This matter is before the Court on the Motion to Intervene [Doc. 19] of Animal Welfare Institute, Whale and Dolphin Conservation, Whale and Dolphin Conservation, Inc. (North America), Cetacean Society International, and Earth Island Institute (collectively "Movants").

## I. FACTUAL AND LEGAL BACKGROUND

Plaintiff Georgia Aquarium, Inc. filed this action on September 30, 2013, seeking judicial review under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 *et seq.*, of Defendants'[1] denial of a permit to import 18 beluga whales (Delphinapterus leucas) from Russia to the United States for the purpose of public display. (Compl. ¶ 1.)

The MMPA was enacted to protect marine mammal species and population stocks that are or may be "in danger of extinction or depletion as a result of man's activities." *Florida Marine Contractors v. Williams,* 378 F.Supp.2d 1353, 1356 (M.D.Fla.2005) (quoting 16 U.S.C. § 1361(1) (enumerating the congressional findings and policies intended to be served by the Act)); *see also, e.g., Kanoa Inc. v. Clinton,* 1 F.Supp.2d 1088, 1093 (D.Haw.1998) (noting that the MMPA

was enacted to ensure the protection and conservation of marine mammals). A primary purpose of the MMPA is to prevent marine mammals species and population stocks from "diminish[ing] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and ... below their optimum sustainable population." *Id.* (quoting 16 U.S.C. § 1361(2)). Congress found that "marine mammals [are] resources of great international[2] significance, esthetic and recreational as well as economic," and declared that "they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management [and] it should be the goal to obtain an optimum sustainable population keeping in mind the carrying capacity of the habitat." *Id.* at 1356–57 (quoting 16 U.S.C. § 1361(6)).

In furtherance of these goals, the MMPA imposes a moratorium on the taking and importation of marine mammals, subject to certain exceptions. *See* 16 U.S.C. § 1371. The MMPA provides an exception to the moratorium on the importing of marine mammals for public display when the applicant: (1) offers a program of education or conservation based on professionally recognized standards; (2) is a registered/licensed exhibitor under the Animal Welfare Act (7 U.S.C. 2131 *et seq.*); (3) maintains facilities that are open to the public on a regularly scheduled basis and that access to such facilities is not limited or restricted other than by charging of an admission fee; and (4) satisfies the issuance criteria in the MMPA implementing regulations. 16 U.S.C. §§ 1371(a)(1), 1374(c)(2)(A); 50 C.F.R. § 216.34. The MMPA explicitly prohibits the import of any marine mammal that was—(1) pregnant at the time of taking; (2) nursing at the time of taking, or less than eight months old, whichever occurs later; (3) taken from a species or population stock which the Secre-

---

**1.** Defendants include: (1) Penny Pritzker, the current Secretary of Commerce, sued in her official capacity, responsible for overseeing the proper administration and implementation of the MMPA (Compl. ¶ 9); (2) National Oceanic and Atmospheric Administration ("NOAA"), an agency of the United States Department of Commerce with supervisory responsibility for the National Marine Fisheries Service, which has been delegated responsibility to ensure compliance with the MMPA, (*Id.* ¶ 10); and (3) National Marine

Fisheries Service ("NMFS"), an agency of the United States Department of Commerce that has been delegated primary responsibility to ensure compliance with the MMPA within the Department of Commerce, (*Id.* ¶ 11).

**2.** Congress also declared that "negotiations should be undertaken immediately to encourage the development of international arrangements for research on, and conservation of, all marine mammals." 16 U.S.C. § 1361(4).

tary has, by regulation, designated as depleted; or (4) taken in a manner deemed inhumane by the Secretary. 16 U.S.C. § 1372(b); 50 C.F.R. § 216.12(c).

Plaintiff Georgia Aquarium, Inc., ("Georgia Aquarium") is a private 501(c)(3) not-for-profit corporation organized under the laws of the State of Georgia that operates aquaria in Atlanta, Georgia and St. Augustine, Florida and funds marine conservation and education programs.[3] (*See* Compl. ¶ 8; *see also* Permit Application[4] at 1.) Georgia Aquarium sought to import the subject beluga whales "to enhance the North American beluga breeding cooperative by increasing the population base of captive belugas to a self-sustaining level and to promote conservation and education." (Permit Application at 1.) The whales were previously captured and collected in the Sakhalin Bay of the Sea of Okhotsk in 2006, 2010, and 2011 by a team led by Dr. Lev Mukhametov, Director of Utrish Dolphinarium, Ltd. (*Id.* at 10, 12.) According to the Permit Application,

[t]his group has been collecting marine mammals in Russia, including beluga whales in the White Sea and in the Sea of Okhotsk, for over 30 years. The collection was conducted in accordance with permits issued by the Russian Federation and ... applicable laws and regulations of the Russian Federation. The beluga whales to be imported are also being held in full compliance with the laws and regulations of the Russian Federation.

(*Id.* at 12; *see also* Compl. ¶¶ 3, 54–55, 57.) Since their capture, the subject whales have been held at the Utrish Marine Mammal Research Station (UMMRS) on the Russian coast of the Black Sea. UMMRS is part of the Russian Academy of Science's Severtsov Institute of Ecology and Evolution, with a staff of trainers, veterinarians, water engineers, scientists, and other support personnel. (Compl. ¶ 64.)

Georgia Aquarium's permit proposed that the whales would be transported overseas from Russia by aircraft to Atlanta, Georgia and New York, New York. (Permit Application at 3.) Upon arrival in the U.S., approxi-

mately six of the whales would be transported to the Georgia Aquarium in Atlanta and the remaining whales would be transported to Sea World Orlando, Sea World San Antonio, Sea World San Diego, Mystic Aquarium, and Shedd Aquarium pursuant to breeding loans. (*Id.*)

After an extensive review and comment period, Defendants denied the permit on August 5, 2013 for three express reasons. (*See* Compl. ¶ 4; *see also* Permit Denial[5].) First, Defendants determined that Georgia Aquarium did not demonstrate that the proposed import "by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock" in accordance with 50 C.F.R. § 216.34(4):

We cannot discount the likelihood that total removals from this stock have exceeded the total net production on an annual basis resulting in a small, but steady and significant decline over the past two decades. Further, the ongoing live-capture trade since 1989 may have contributed to a cumulative decline over the past two decades, and we considered this in combination with other past, present, and foreseeable future actions. Therefore, we are unable to make the determination that the proposed activity, by itself or in combination with other activities, would not likely have had a significant adverse impact on the species or stock.

(Permit Denial at 1.) Second, Defendants denied the permit application because Georgia Aquarium did not demonstrate that the proposed import would not likely result in the taking of marine mammals beyond those authorized by the proposed permit in accordance with 50 C.F.R. § 216.34(7):

We have determined that the requested import will likely result in the taking of marine mammals beyond those authorized by the permit. There are ongoing, legal marine mammal capture operations in

---

3. The Complaint details Georgia Aquarium's educational mission and programs and commitment to animal health and research. (Compl. ¶¶ 27–53.)

4. http://www.nmfs.noaa.gov/pr/permits/sci_res_pdfs/17324_final_application.pdf.

5. http://www.nmfs.noaa.gov/pr/permits/sci_res_pdfs/17324_denial_letter_final.pdf

Russia that are expected to continue, and we believe that issuance of this permit would contribute to the demand to capture belugas from this stock for the purpose of public display worldwide, resulting in the future taking of additional belugas from this stock.

(*Id.* 1–2) Third, Defendants found that Georgia Aquarium did not demonstrate that the whales proposed for importation were not nursing at the time of taking in accordance with 16 U.S.C. § 1372(b)(2) and 50 C.F.R. § 216.12(c):

We have determined that five of the [18] beluga whales proposed for import, estimated to be approximately 1.5 years old at the time of capture, were potentially still nursing and not yet independent [of their mothers]. This would only result in the inability to import these five specific animals, if not for the other criteria that you did not meet.

(*Id.* at 2.)

On September 30, 2013, Georgia Aquarium filed the pending action pursuant to 16 U.S.C. § 1374(d)(6) and 50 C.F.R. § 216.33(7) which provides that "[t]he applicant or any party opposed to a permit may seek judicial review of the terms and conditions of such permit or of a decision to deny such permit." Movants, a collection of environmental non-profit organizations with programs dedicated to the conservation and welfare of wild and captive beluga whales and other cetaceans, filed their Motion to Intervene on January 7, 2014, four days after Defendants filed their Answer.

## II. DISCUSSION

Movants Animal Welfare Institute, Whale and Dolphin Conservation, Whale and Dolphin Conservation, Inc. (North America), Cetacean Society International, and Earth Island Institute assert that they are entitled to intervention as a matter of right pursuant to Rule 24(a) of the Federal Rules of Civil Procedure or, in the alternative, permissive intervention under Rule 24(b).[6]

6. Plaintiff Georgia Aquarium does not dispute the timeliness of the Movant's request. Plaintiff filed its case on September 30, 2013, and Defendants filed their Answer on January 3, 2014.

### A. Standards for Granting Intervention Under Federal Rule of Civil Procedure 24

Rule 24(a) provides for intervention as a matter of right as follows:

On timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P. 24(a). Alternatively, Rule 24(b) provides for permissive under the following circumstances:

On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or has a claim or defense that shares with the main action a common question of law or fact.

FED. R. CIV. P. 24(b)(1). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." FED. R. CIV. P. 24(b)(3).

### B. Background on Proposed Intervenors Animal Welfare Institute, Whale and Dolphin Conservation, Whale and Dolphin Conservation, Inc. (North America), Cetacean Society International, and Earth Island Institute

#### i. *Animal Welfare Institute*

Proposed Intervenor Animal Welfare Institute ("AWI") is a nonprofit charitable corporation founded in 1951 to "reduce animal suffering caused by people." (Millward Decl. ¶ 1.) AWI seeks to intervene in this action on behalf of itself and its members, staff, and officers who include wildlife biologists, marine mammal scientists, students, and citizens who have conservation, aesthetic, and professional connections to cetaceans, includ-

Other than the entry of a Scheduling Order on February 27, 2014, no substantive proceedings have taken place. Movant's motion, filed on January 7, 2014, is therefore timely.

ing beluga whales, in the wild and in captivity.[7] (*Id.* ¶¶ 1, 6.)

AWI's mission includes preserving species threatened with extinction and protecting wildlife from harmful exploitation and destruction of critical habitat. AWI is dedicated to the protection of cetaceans and their habitats and advocates for new approaches to marine life conservation that will help keep cetaceans from becoming threatened or endangered species. Further, AWI is an advocate for marine life in native habitats.... AWI expends resources on domestic and international marine life projects and programs that, through advocacy, research, education, and grassroots activities, seek to conserve marine mammal species—including beluga whales—and their habitats, end the commercial exploitation and slaughter of marine mammals, and mitigate other anthropogenic threats to their survival. AWI projects and programs on cetacean welfare and conservation include efforts to end commercial whaling, limit abuse of "scientific" whaling, ensure adequate management of subsistence whaling quotas, and strengthen international governance on whaling. AWI also conducts and supports projects and programs for responsible public whale watching in the wild, reducing capture and trade of cetaceans, and eliminating the holding of cetaceans in captivity for public display.

(*Id.* ¶¶ 1, 3.) In support of this mission, AWI works with local, state, federal, and international officials and agencies to promote marine life protection laws and regulations and regularly advocates for proper implementation and enforcement of the Marine Mammal Protection Act by routinely submitting comments to the National Marine Fisheries Service on applications to import cetaceans into the United States. (*Id.* ¶¶ 4, 5.)

AWI employs a marine mammal scientist, Naomi Rose, PhD, to oversee its Captive Marine Mammal Program. (Rose Decl. ¶ 6.)

AWI monitors for domestic and international activities that result in the suffering of marine mammals for public display, including transports, trade, wild captures, and the establishment of new facilities. AWI uses public outreach, engaging with governments and officials, media, and other means to protect marine mammals affected by public display activities.

(*Id.*) AWI also contributes to the IWC Small Cetacean Conservation Research Fund, which funds scientific research on small cetacean stocks, including research on the Sea of Okhotsk beluga whale stocks. (Milward Decl. ¶ 4.)

AWI and its members participated in the regulatory review process of Georgia Aquarium's permit application. (*Id.* ¶ 5.) AWI biologist, Naomi Rose, Phd., reviewed Georgia Aquarium's permit application and during the public comment period, prepared and submitted a detailed comment expressing opposition to the permit application based on several grounds, including:

(1) that the proposed import presents unnecessary risks to the health and welfare of the beluga whales to be imported; (2) at

---

**7.** AWI also submitted the Declaration of its member, Rodney Russ, a former wildlife biologist for the New Zealand Wildlife Service and current Director, General Manager, and Senior Expedition Leader for Heritage Expeditions Limited ("Heritage"), whose interest as a member of AWI is to support its marine life programs that work to conserve and protect marine mammals. (*See* Russ Decl. ¶¶ 1–3.) Heritage is a for-profit, family-owned New Zealand corporation, which operates its own Russian-chartered polar and oceanographic research vessel on ecotourism expeditions to Antarctica, the Sub Antarctic, through the Pacific, and the Russian Far East, including the Sea of Okhotsk and the Sakhalin Bay–Amur River region of Russia. (*Id.* ¶ 3.) Russ/Heritage leads annual expeditions to the Sea of Okhotsk to observe cetacean populations including various beluga whales stocks. (*See*

Russ Decl. ¶¶ 10, 11.) According to Russ, opportunities to view cetaceans, including beluga whales, is one of the priorities of the Sea of Okhotsk expedition for the purpose of educating the public and showing the importance of conserving and protecting these wild animals. (*Id.* ¶ 13.) Russ is interested in the Court's disposition of NMFS's decision to deny Georgia Aquarium's permit application because the overall quality and profitability of his international ecotourism company's Sea of Okhotsk expeditions depend on the quality of the Sea of Okhotsk environment and the nature experiences available to potential travelers on its expeditions such that any degradation of the Sea of Okhotsk environment, particularly removals of the beluga whales, may impair the quality of the Sea of Okhotsk expeditions and ultimately the operations of his business. (*Id.* ¶¶ 20–22.)

least five of the animals to be imported were likely nursing at the time of their capture; (3) this import, in combination with other activities occurring in the Sakhalin Bay–Amur River region of Russia, would have a significant adverse impacts on the Sakhalin–Amur stock of beluga whales in the Sea of Okhotsk; and (4) granting import permits related to the capture operation in the Sea of Okhotsk promotes and encourages trade in Russian beluga whales and will lead to future takes beyond those authorized by the requested permit.

(Rose Decl. ¶ 9.) Rose also drafted and submitted to NMFS a scientists' statement in opposition to the permit application signed by twenty-nine marine mammal biologists, ecologists, and ecotourism specialists.[8] (Id. ¶ 11.) Rose and other AWI staff testified at the public hearing held by NMFS on the Georgia Aquarium's permit application and draft environmental assessment ("EA"). (Id. ¶ 10.) In addition, Rose attended the International Whaling Commission's Scientific Committee in June 2013 and participated in the Subcommittee on Small Cetaceans. Concerned with Russian quotas permitting live-capture and other removals of beluga whales from the Sakhalin–Amur stock, Rose and other scientists on the Subcommittee, including scientists from the NMFS, conducted a scientific review of the Sea of Okhotsk beluga whale stocks. The Subcommittee concluded that the quotas for the Sea of Okhotsk population are unsustainable and that "intensive capture operations [and] the current scheme for managing the beluga live-capture operations in the Sea of Okhotsk is very likely to lead to unsustainable removals, placing at least the Sakhalin–Amur summer aggregation in Sakhalinsky Bay at high risk of depletion."[9] (Id. ¶ 12, 14.)

 *ii. Whale and Dolphin Conservation and Whale and Dolphin Conservation, Inc. (North America)*

Proposed Intervenor Whale and Dolphin Conservation ("WDC"), founded in 1987, is a nonprofit corporation and international charity headquartered in the United Kingdom, dedicated to the conservation and protection of whales, dolphins, and porpoises (cetaceans). (Stroud Decl. ¶ 1.) Proposed Intervenor Whale and Dolphin Conservation, Inc. (North America) ("WDC–NA") is the U.S. affiliate office of WDC. (Id.) With approximately 100,000 supporters worldwide, WDC/WDC–NA's mission is to "eliminate the continuing threats to cetaceans and their habitats, to raise awareness of cetaceans, and to educate people about the need to address the continuing threats to their welfare and survival." (Id.; see also Asmutis–Silvia Decl. ¶ 1.) WDC expends resources on projects and programs that, through advocacy, research, education, and grass-roots activities, aimed at protecting cetaceans from such threats as hunting, live captures, captivity, chemical and noise pollution, ship collisions, entanglement, and climate change. (Id. ¶ 4; Asmutis–Silvia Decl. ¶ 3.)

> WDC projects and programs on cetacean welfare and conservation include efforts to stop commercial whaling, create marine protected areas for cetaceans, reintroduce captive cetaceans, including beluga whales, into the wild, promote responsible whale watching, and educate people on cetaceans and the threats they face.

(Stroud Decl. ¶ 4) WDC has supported research projects on beluga whales in Russia, as well as research projects on other cetacean species in Russia, including funding the construction of tourist trails and viewing towers in the White Sea region of Russia to facilitate shore-based beluga whale watching. (Id. ¶ 6.) WDC has also supported efforts to protect cetacean habitat in the Russian Far East, including work to establish marine protected areas and critical habitat in the Kamchatka region at the southeastern edge of the Sea of Okhotsk. (Id.) Since its founding in 1987, WDC has run an active campaign

---

**8.** *See* Naomi A. Rose et al., Scientist Statement Opposing the Beluga Imports by the Georgia Aquarium (Oct. 29, 2012) (comment No. NOAA–NMFS–2012–0158–8725), *available at* www.regulations.gov.

**9.** *See* Int'l Whaling Comm'n, Rep. of the Subcomm. on Small Cetaceans, *available at* http://iwc.int/cache/downloads/4r6wjwdcu3uogs4ssgso8soc4/AnnexL.pdf.

against the capture, trade, and captivity of beluga whales, including providing comments on video footage of live-capture operation of beluga whales in the Sea of Okhotsk, lobbying the Russian authorities to cease live-captures of Russian beluga whales and exports of beluga whales from Russia, and challenging exports of Russian beluga whales for national aquariums. (*Id.* ¶¶ 7–9; Asmutis–Silvia Decl. ¶ 5.)

WDC members were active in opposing the import of these eighteen beluga whales through encouraging its supporters to comment, testifying at the public hearing, and submitting written comments on the permit application and the corresponding environmental review process under the National Environmental Policy Act. (Stroud Decl. ¶ 11.) According to WDC's Chief Executive Officer and President of WDC–NA, WDC members have an interest in the Court's review of Defendant's permit denial because (1) the live-capture operations conducted by the Utrish Dolphinarium, Ltd. have impaired WDC programs and conservation field projects in Russia by capturing cetaceans that are the subjects of WDC programs and field projects, including the beluga whales in the White Sea and the Okhotsk Sea the Okhotsk Sea, (*Id.* ¶ 10); (2) if allowed, the import would impair WDC programs and conservation field projects, by allowing the Georgia Aquarium and other entities to provide financial and other support to Utrish Dolphinarium, Ltd. live-capture operations will continue unabated to capture additional cetaceans in order to satisfy the demand for live-captured whales by foreign countries for public display, (*Id.* ¶ 12); (3) by providing U.S. endorsement of the unsustainable and expanding international trade in live-captured beluga whales that WDC has expended significant resources working to halt, the granting of the permit to import the beluga whales and for public display at facilities throughout the United States will require WDC to continue diverting resources to in-creased advocacy, research, and education on projects and programs that seek to enhance the conservation and welfare of beluga whales in the wild and in captivity, (*Id.* ¶ 13.); and (4) the import would also impair the conservation, aesthetic, professional, and emotional benefits that WDC's staff and supporters derive from researching and watching beluga whales and other cetaceans in Russia. (*Id.* ¶ 14.)

### iii. Cetacean Society International

Proposed Intervenor Cetacean Society International ("CSI") is a nonprofit corporation founded in 1974 to "protect the viable habitat of, and cease all killing and captive display of cetaceans, and to promote benign activities such as regulated whale watching, nonlethal and humane research, and widespread educational, environmental, and observation programs related to free-roaming cetaceans internationally." (Rossiter Decl. ¶ 1.) CSI seeks to intervene in this suit on behalf of itself and its approximately 150 [10] members, officers, and directors include cetacean scientists, students, and citizens who have numerous "geographic, professional, recreational, aesthetic, emotional, spiritual, and economic connections to cetaceans, including beluga whales, in the wild and in captivity." [11] (*Id.* ¶ 6.) Since 1982, CSI has awarded over 1,200 grants, as well as nonmonetary support, to applicants from at least nineteen countries working on cetacean science, conservation, and education projects focused on at least fifty cetacean species, including beluga, gray, and orca whales in Russian waters. CSI also contributes to the IWC Small Cetacean Conservation Research Fund, which funds scientific research on small cetacean populations, including research on the Sea of Okhotsk beluga whale stocks. (*Id.* ¶ 5.)

CSI opposed the import of these eighteen beluga whales through investigating, commenting, encouraging its members to comment, testifying at the public hearing, and

---

**10.** CSI has approximately 450 supporters worldwide. (Rossiter Decl. ¶ 1.)

**11.** CSI has numerous members and supporters who live, work, and recreate near the public display facilities that will be receiving beluga whales that the Georgia Aquarium seeks to im-port—the Georgia Aquarium in Atlanta, the Shedd Aquarium in Chicago, the Sea World facilities in Orlando, San Antonio, and San Diego, as well as the Mystic Aquarium in Mystic, Connecticut. (Rossiter Decl. ¶ 6.)

sending correspondence to the National Marine Fisheries Service ("NMFS"). (*Id.* ¶ 7.) CSI filed written comments on the permit application and the corresponding environmental review process under the National Environmental Policy Act. (*Id.*) According to CSI's President William Rossiter, CSI has an interest in the judicial review of Defendants' permit denial because "[i]f the Georgia Aquarium succeeds in this litigation, the import would impair CSI's cetacean conservation and welfare programs. The import will harm CSI's projects and programs on cetacean conservation and welfare, on which CSI has expended significant resources, by undermining two decades of progress toward permanent cessation of sourcing cetaceans from the wild by U.S. facilities for public display." (*Id.* ¶ 8.)

### iv. Earth Island Institute

Proposed Intervenor Earth Island Institute ("EII") is a nonprofit corporation with 35,000 members [12] founded to "develop and support projects that counteract threats to the biological and cultural diversity that sustains the environment." (Phillips Decl. ¶ 1.) Through its International Marine Mammal Project, EII expends resources on more than sixty environmental projects, including projects in Russia and other countries in Asia, including the Baikal Watch project that works in Russia to promote the permanent protection of biologically rich areas within the larger Lake Baikal watershed gray whales and other cetaceans of the Sea of Okhotsk and surrounding area. (*Id.* ¶ 4.) EII's International Marine Mammal Project "has worked to protect cetaceans in Russia" by contributing to letters against the capture and export of cetaceans from Russia and actively participates in proceedings of the International Whaling Commission ("IWC") as a nongovernmental organization observer, working to halt unsustainable Russian commercial whaling. (*Id.* ¶ 6.) According to

12. "EII's members, staff, and officers include cetacean scientists, beluga whale specialists, students, and citizens who have numerous geographic, professional, recreational, aesthetic, emotional, spiritual, and economic connections to cetaceans, including beluga whales, in the

David Phillips, Executive Director of Earth Island Institute,

> EII's members, supporters, staff, and officers are concerned about, and directly affected by, the unsustainable and expanding international trade in live-captured beluga whales, the importation of beluga whales for public display purposes, and the welfare of beluga whales in captivity. EII has been very active in opposing the import of these eighteen beluga whales through encouraging its members to comment, testifying at the public hearing, and submitting written comments on the permit application and the corresponding environmental review process under the National Environmental Policy Act ("NEPA").

(*Id.* ¶ 8.)

### C. Whether Movants Have a Satisfied Rule 24's Requirements for Intervention

■ Movants assert that § 1374(d)(6) of the MMPA, which provides a broad right to seek judicial review of MMPA permitting decisions, grants them an unconditional right to intervene in an action by a permit applicant over NMFS's refusal to issue a permit to which they are opposed. Section 1374(d)(6) of the MMPA provides that "[a]ny applicant for a permit, or any party opposed to such permit, *may* obtain judicial review of the terms and conditions of any permit issued ... or of [the] refusal to issue such a permit." (emphasis added). "[A]n intervenor possesses a statutory right to intervene only when a federal statute unambiguously grants the applicant an unconditional right to participate in litigation.... If the intervenor must fulfill conditions, such as proving an 'interest' that has been impaired or impeded, then the legislation is conditional, not unconditional, and Rule 24(a)(1) is not applicable." *Oakland Cnty. v. Fed. Nat. Mortgage Ass'n,* 276 F.R.D. 491, 494 (E.D.Mich.2011) (quoting 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 24.02 (3d ed.2011)).

wild and in captivity. EII has 10,000 members that research and watch cetaceans around the world, including work in Russia to protect the Western population of gray whales and other cetaceans in the Sea of Okhotsk and related areas." (Phillips Decl. ¶ 7.)

██ Judicial review of a permitting decision under the MMPA is undertaken pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701–06. *See* 16 U.S.C. 1374(d)(6). Section 702 of the APA provides for the right to judicial review to "person[s] suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. A party seeking judicial review of an agency action pursuant to the APA must still have standing to sue under the statutes at issue. *See Sierra Club v. Morton*, 405 U.S. 727, 738–39, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (holding that "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA" and that a party seeking review must allege facts showing that the party is itself adversely affected and has a direct stake in the outcome.) [13] Thus, a party's entitlement to seek judicial review under the MMPA is conditioned on whether it can demonstrate it has (1) suffered an "injury in fact," i.e., an invasion of a legally protected interest which is concrete and particularized, that is "actual or imminent" and not "conjectural or hypothetical;" (2) there is a causal connection between the injury and the challenged action; and (3) it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." [14] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Accordingly, the Court finds that § 1374(d)(6) does not grant Movants an unconditional statutory right to intervene in Georgia Aquarium's judicial appeal of the permit denial. *See Cisneros v. Corpus Christi Independent School Dist.*, 560 F.2d 190, 191 (5th Cir.1977) (finding that statutes using the permissive word "may" instead of the unconditional "shall" and in terms of "seeking" intervention create merely a conditional right to intervene rather than an absolute right to intervene under Rule 24(a)). At a minimum, it does, though, provide Movants with a conditional right to intervene as contemplated by Rule 24(b) allowing permissive intervention. *See id.*

Georgia Aquarium objects to Movants' intervention as a matter of right because their "ultimate objectives" in this action—the protection of beluga whales from captivity and preventing capture of marine mammals for public display—are not legally protectable interests for intervention in this case. *E.g., Meek v. Metropolitan Dade County*, 985 F.2d 1471, 1477 (11th Cir.1993) (absent a statutory grant of a right to intervene, an applicant under Rule 24(a) must possess a direct, substantial, and legally protectable interest in the subject matter of the suit.) Because the MMPA explicitly authorizes the public display of marine mammals, including their collection from the wild and import, neither the merits of public display, nor the legality of collecting and importing animals for that purpose are at issue in this litigation.[15] Georgia Aquarium further asserts that Movants do not have a cognizable interest in the 18 beluga whales at issue in this case which come from one of three different stocks of whales in the Sea of Okhotsk and that they assert nothing more than a generalized conservation interest in cetaceans. Georgia

**13.** The Court recognized however that an organization whose members are injured may represent those members in a proceeding for judicial review. *Sierra Club v. Morton*, 405 U.S. at 739, 92 S.Ct. 1361 (citing *NAACP v. Button*, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)).

**14.** This is not to say that Rule 24 requires a party seeking to intervene to demonstrate that it has standing in addition to meeting the requirement of Rule 24 that it have a direct, substantial, and legally protectable interest in the litigation. *See Chiles v. Thornburgh*, 865 F.2d 1197, 1212 (11th Cir.1989) (noting that standing cases are only relevant "to help define the type of interest that

the intervenor must assert"); *see also Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1252, n. 4 (10th Cir.2001) (noting that Article III standing requirements are more stringent than those for intervention under Rule 24(a)).

**15.** Similarly, Georgia Aquarium asserts that movants have failed to assert interests subject to impairment because Defendants do not have jurisdiction under the MMPA to regulate marine mammal capture activities in Russia and that if not imported here, the beluga whales will be sold to another public display facility and will not be returned to their native habitat.

Aquarium further challenges Movants' intervention because even if Movants have legally protectable interests, such interests will be adequately represented by Defendants who share the same objective in defending the permit denial.

Movants do not dispute that the MMPA allows for the import of the subject beluga whales for public display, provided certain statutory and regulatory criteria are met, nor do they dispute that opposition to public display is not a legally protectable interest under Rule 24(a). Rather, Movants claim that they and their members have direct, substantial, and legally protectable programmatic, conservation, aesthetic, economic and professional interests relating to the "likely depleted Sakhalin–Amur stock of beluga whales and other cetaceans in the Sea of Okhotsk, which the import may impair by causing future captures" which was one of the reasons for the permit denial. *See Chiles v. Thornburgh,* 865 F.2d 1197, 1214 (11th Cir.1989) (a proposed intervenor's "interest need not, . . . 'be of a legal nature identical to that of the claims asserted in the main action.' ") Although Movants do not assert that their participation in the administrative process automatically creates an intervention right, it is a factor courts have considered in applying the interest test. Finally, Movants assert that the presumption that their interests are adequately represented where they share the same ultimate objective with an existing party to the litigation can be easily rebutted by showing "that they bring something to the litigation that otherwise would be ignored or overlooked if the matter were left to the already-existing parties." 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 24.03(4)(a)(i) (3d ed.2013). To that end, Movants contend that (1) Defendants have "dual and at times conflicting responsibilities" under the MMPA's public display provisions; (2) Movants have distinct conservation and animal welfare interests from Defendants; and (3) Defendants failed to consider a relevant scientific review of the Sea of Okhotsk beluga whale stocks conducted at

the June 2013 meeting of the International Whaling Commission's Scientific Committee to support its decision.

 Because Movants meet the standard for permissive intervention under Rule 24(b) as explained below, the Court need not determine whether they are entitled to intervene as a matter of right under the more stringent standard in Rule 24(a). Rule 24(b)(2) provides for permissive intervention when an applicant's claim or defense and the main action have a question of law or fact in common. The determination of whether permissive intervention is proper in a case is a two-step process. *E.g. Meek v. Metro. Dade Cnty., Fla.,* 985 F.2d 1471, 1478 (11th Cir. 1993), *abrogated on other grounds by Dillard v. Chilton Cnty. Comm'n,* 495 F.3d 1324 (11th Cir.2007). The court must first determine whether the applicant's claim or defense and the main action share common questions of law or fact. *Id.* If this requirement is fulfilled the court must exercise its discretion in determining whether intervention should be allowed. *Id.* (citing *Stallworth v. Monsanto Company,* 558 F.2d 257 (5th Cir.1977)). "Rule 24(b)(2) plainly dispenses with any requirement that the intervenor shall have a direct personal or pecuniary interest in the subject of the litigation." *Id.* (quoting *SEC v. United States Realty and Improvement Co.,* 310 U.S. 434, 459, 60 S.Ct. 1044, 84 L.Ed. 1293 (1939)). Thus the claim or defense clause of Rule 24(b)(2) is generally given a liberal construction. *Id.* (citing *Stallworth v. Monsanto,* 558 F.2d 257); *In re Estelle,* 516 F.2d 480, 485 (5th Cir.1975). "However, the intervening party must demonstrate more than a general interest in the subject matter of the litigation before permissive intervention is allowed." *In re Estelle,* 516 F.2d at 485 (citing *Alexander v. Hall,* 64 F.R.D. 152 (D.S.C.1974)).

 Georgia Aquarium acknowledges that Movants have the same objective as Defendants in defending the permit denial.[16] In its Complaint for Declaratory and Injunctive Relief, Georgia Aquarium challenges Defen-

16. Georgia Aquarium asserts, however, that Movants seek to go beyond the mere denial of the permit in pursuing their "ultimate objective" of stopping "capture for public display." Movants indicate in their Reply that they do not intend to assert such an interest nor do they seek to challenge generally the issuance of a permit for public display in this litigation.

dant's denial of the import permit as violating the statutory and regulatory issuance criteria under the MMPA and the APA as it relates to Defendants' findings with regard to impacts of the import on wild beluga whale population stocks, whether the permit will result in additional removals from the Sea of Okhotsk, and whether 5 of the 18 beluga whales were nursing at the time the taking. As stated succinctly in their opening brief, Movants here (1) seek to defend NMFS's action on the grounds that none of its reasons for denying the permit application violate the MMPA or the APA; (2) seek to argue that the denial is supported by the evidence in the administrative record, including evidence in the IWC Scientific Committee's scientific review of the Sea of Okhotsk beluga whale stocks that Movants submitted to NMFS during its decision-making process; and (3) seek to defend NMFS's recognition of the link between international trade in cetaceans and impacts to wild stocks. Movants further assert that these defenses overlap with the Georgia Aquarium's contrary claims.

Particularly enlightening to the Court's inquiry is the fact that it appears that Defendants relied on comments made by and information presented by some of the Movants during the administrative process in making its decision to deny the permit. (*See* Permit Denial "§ D. Public Comments" at 16–24.) Defendants issued their denial based on a "review of the application and other relevant information, including comments provided by the Commission, APHIS, and the public." (*Id.* at 24.) The Permit Denial noted that Movants' comments and concerns "that the belugas of the Sakhalin–Amur region are a recovering population, the threats have not been adequately addressed, and the [Potential Biological Removal "PBR"] calculation does not support the current take of animals in this area" were "directly relevant" to its determination that Georgia Aquarium did not satisfy "MMPA issuance criteria (216.34(a)(4)) which states that the proposed activity by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock":

In this case, the specific stock under consideration is the Sakhalin–Amur region in the Sea of Okhotsk. The sustainability of the live-capture operation is discussed in Attachment 1, and the subsection of the *Issuance Criteria* section considering whether *the proposed activity by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock.*

(Permit Denial at 18–19.) The Permit Denial further noted that the following comments were "directly relevant" to its determinations in the sections of the report related to "Issuance Criteria" and "Prohibited Importation":

Given that these animals were collected as part of a continuing capture operation, commenters stated that additional animals will be taken beyond those authorized if a permit to import these belugas is issued, therefore, failing to meet the MMPA issuance criteria.... Commenters noted the 1.5 year age estimate at the date of capture for several of the belugas and indicated that these animals would be considered animals that were still nursing and dependent on their mothers.

(Permit Denial at 21.)

It appears that some or all of the Movants seeking to intervene in Georgia Aquarium's judicial appeal were instrumental in informing Defendants' determination to deny the permit. The Court thus finds that Movants have shown the requisite interest in seeking to assert questions of law or fact in common with the main action and are not merely seeking to assert a generalized interest in the outcome of this case. The Court further finds that allowing intervention by Movants will not unduly delay or prejudice the adjudication of Georgia Aquarium's claims as this litigation is in a relatively nascent stage and none of the deadlines approved in the February 27, 2014 Scheduling Order have passed.[17]

Accordingly, the Court **GRANTS** Movants' request for permissive intervention pursuant to Rule 24(b) with respect to Animal Welfare Institute, Whale and Dolphin Conservation,

---

**17.** To the extent Intervenors desire to file any motions concerning the content of the Administrative Record, the Court grants them an additional ten (10) days until May 12, 2014 to file such motions.